**LEISNOI, INC., Plaintiff–Appellant,**

v.

**Omar STRATMAN, Defendant–Appellee.**

**No. 97–35775.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 14, 1998.

Decided Sept. 8, 1998.

Robert L. Breckberg (argued), Edgar Paul Boyko & Associates, Anchorage, Alaska, for the plaintiff-appellant.

Michael J. Schneider (argued), Law Offices of Michael J. Schneider, Anchorage, Alaska, for the defendant-appellee.

Robert H. Hume, Jr., Copeland, Landye, Bennett and Wolf, Anchorage, Alaska, for Ouzinkie Native Corporation, Natives of Kodiak, Inc., and Yak–Tat Kwaan, Inc., amici curiae.

Philip Blumstein, Birch, Horton, Bittner and Cherot, Anchorage, Alaska, for Chugach Alaska Corporation, amicus curiae.

Before: FARRIS, O'SCANNLAIN, and MICHAEL DALY HAWKINS, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must determine whether a "Village Corporation" may prevent a "Regional Corporation" from authorizing sand-and-gravel mining near Kodiak under the Alaska Native Claims Settlement Act.

## I

In 1971, Congress enacted the Alaska Native Claims Settlement Act ("ANCSA"), *see* Act of December 18, 1971, Pub.L. No. 92–203, 85 Stat. 688 (codified at 43 U.S.C. § 1601–1629a), a "legislative compromise" designed to resolve land disputes between the federal government, the state of Alaska, Alaskan Natives, and non-native settlers. *City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381, 1383 (9th Cir.1996). Under this compromise, Alaskan Natives received, in exchange for the extinction of all claims of aboriginal title, approximately forty-four million acres of land and nearly $1 billion in federal funds. *See* 43 U.S.C. §§ 1605, 1607, 1613. Much of this land was distributed in fee simple to "Regional Corporations"[1] and to "Village Corporations."[2] ANCSA divided the state of Alaska into twelve geographic regions, each with a Native-owned Regional

---

1. A "Regional Corporation" is defined as "an Alaska Native Regional Corporation established under the laws of the State of Alaska in accordance with the provisions of this chapter." 43 U.S.C. § 1602(g).

2. A "Village Corporation" is "an Alaska Native Village Corporation organized under the laws of the State of Alaska as a business for profit or nonprofit corporation to hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf of a Native village in accordance with the terms of this chapter." 43 U.S.C. § 1602(j).

Corporation. *See* 43 U.S.C. § 1606(a). Within these twelve regions are many villages represented by Village Corporations, over 200 in total. *See* 43 U.S.C. § 1607.

Unfortunately, through the years, the Regional and Village Corporations have often found themselves in court as adversaries. *See, e.g., Koniag, Inc. v. Koncor Forest Resource,* 39 F.3d 991 (9th Cir.1994); *Tyonek Native Corp. v. Cook Inlet Region, Inc.,* 853 F.2d 727 (9th Cir.1988). The litigation has had much to do with the fact that twenty-two million acres of ANCSA land are "dually owned": The *surface* estate belongs to the Village Corporations, and the *subsurface* estate to the Regional Corporations. *See* 43 U.S.C. §§ 1611, 1613. Because of ambiguities in these abutting land rights, controversies have arisen.

This case is yet another chapter in the ongoing saga that pits surface-estate owner against subsurface-estate owner. In 1974, the Department of the Interior certified Leisnoi, Inc., as a Village Corporation for the Native village of Woody Island. Leisnoi thus became eligible to select over 115,000 acres of land, which it would hold and manage on behalf of the Native village of Woody Island. *See* 43 U.S.C. §§ 1611, 1613. In its application for land benefits, Leisnoi indicated that the Native village was located within two townships on the historic, western side of Woody Island. Generally, a Village Corporation like Leisnoi is allowed to select "all of the township or townships in which any part of the village is located, *plus* an area that will make the total selection equal to" its allotted acreage. 43 U.S.C. § 1611(a)(1) (emphasis added). Leisnoi selected some land on Woody Island, as well as some land on Kodiak Island and Long Island.[3] As explained above, Leisnoi's interest in this land is only in the surface estate.

The Regional Corporation of Koniag received the subsurface estate in the land that Leisnoi selected on Kodiak Island. This land is located near Kalsin Bay, some twelve miles and a channel of water away from the physical structures that identify the Village of Woody Island. Pursuant to a quitclaim deed, Koniag transferred sand-and-gravel rights in a portion of this land to Omar Stratman, who has thus stepped into Koniag's shoes for purposes of this appeal. Leisnoi and Stratman are avowed enemies who have found themselves in court on many occasions over the past twenty years. *See Leisnoi, Inc. v. Stratman,* 835 P.2d 1202, 1214 (Alaska 1992) (summarizing litigation between the two). The dispute in this case arises from Stratman's mining activity on this "dually owned" land on Kodiak Island. Since July 1996, Stratman has been extracting gravel from his subsurface estate. As one might imagine, such operation can damage the surface estate, *see Chugach Natives, Inc. v. Doyon, Ltd.,* 588 F.2d 723, 732 (9th Cir.1978), and destroy artifacts buried in the ground. Wishing to prevent these deleterious effects, Leisnoi asserted that Stratman must obtain its consent before proceeding. Not surprisingly, Stratman disagreed.

Seeking injunctive and declaratory relief, Leisnoi filed suit in federal district court. Stratman responded by moving to dismiss the case under Rule 12(b)(6) or, in the alternative, for summary judgment. The district court granted the motion to dismiss.[4] According to the court, under ANCSA, a subsurface-estate owner (such as Stratman) needs to obtain the consent of a Village Corporation (such as Leisnoi) only when he wishes to mine lands "within the boundaries of a[ ] Native village." *Leisnoi, Inc. v. Stratman,* No. A96–0361–CV, at 16 (D. Alaska Jul. 3, 1997) (quoting 43 U.S.C. § 1613(f) (internal quotation marks omitted)). As the district court saw it, Kodiak Island was simply not within the "boundaries" of the Native village of Woody Island.

Leisnoi timely appealed.[5]

---

3. Unfortunately, Leisnoi could not obtain the land on the western side of Woody Island because of an exception to the general land-selection process. Under 43 C.F.R. 2650.6, Village Corporations may not "select lands which are within 2 miles from the boundary of any home rule or first-class city." Because the western side of Woody Island lay within two miles of the home rule city of Kodiak, the land was unavailable to Leisnoi.

4. The court also dismissed Leisnoi's petition for a preliminary injunction as moot.

5. Leisnoi had also brought claims under the Archaeological Resources Protection Act, 16 U.S.C. § 470aa, and the National Environmental Policy Act, 42 U.S.C. § 4332. The district court dis-

## II

Leisnoi contends that the district court misconstrued the section of ANCSA that vests in Village Corporations the power to withhold consent from, and thereby to preclude, mining operations. Section 14(f) of ANCSA provides that the right "to explore, develop, or remove minerals from the subsurface estate in the *lands within the boundaries of any Native village* shall be subject to the consent of the Village Corporation." 43 U.S.C. § 1613(f) (emphasis added). According to Leisnoi, the "lands within the boundaries of a[ ] Native village" include all lands patented to the Village Corporation, or at least all such lands that the Native village has historically used. Under either interpretation, the lands within the boundaries of the Village of Woody Island would encompass that portion of Kodiak Island on which Stratman has performed his gravel operation, and Leisnoi would be entitled to an injunction.[6] Stratman counters that the boundaries of a Native village should instead be defined by physical structures that indicate occupancy. If his view prevails, then Leisnoi's consent is not required, as the Village of Woody Island has structures only on Woody Island, not on Kodiak Island.

### A

■ When construing statutory language, this court assumes "that the legislative purpose is expressed by the ordinary meaning of the words used." *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1341 (1990) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) (internal quotation marks omitted)). Of course, because words can have alternative meanings depending on context, we interpret statutes, not by viewing individual words in isolation, but rather by "reading the relevant statutory provisions as a whole." *City of Ketchikan*, 85 F.3d at 1385 (internal quotation and citation omitted). We thus interpret the phrase, "lands within the boundaries of any Native village," by looking, first, to the surrounding words in § 14(f) (the subsection containing the consent proviso), and then, to other provisions in ANCSA.[7]

■ Section 14(f) reads, in relevant part: When the Secretary *issues a patent to a Village Corporation for the surface estate in lands* . . ., he shall issue to the Regional Corporation for the region in which the lands are located a patent to the subsurface estate in such lands . . .: Provided, That the right to explore, develop, or remove minerals from the subsurface estate in the *lands within the boundaries of any Native village* shall be subject to the consent of the Village Corporation.

43 U.S.C. § 1613(f) (emphasis added). Quite significantly, the statute expressly contemplates two distinct concepts: first, lands "patent[ed] to a Village Corporation," and second, lands "within the boundaries of a[ ] Native village." *Id.* Whereas a Village Corporation receives title to all "patent[ed]" lands, it has the power to prevent mining, by

missed these claims as well. Because Leisnoi has not appealed on these issues, we do not consider them here.

6. In its complaint, Leisnoi asserted that, as evidenced by archeological findings, the Village of Woody Island historically used this land on Kodiak Island. Because we are reviewing a Rule 12(b)(6) dismissal, we must accept this allegation as true. *See Warshaw v. Xoma Corp.* 74 F.3d 955, 957 (9th Cir.1996).

7. Leisnoi urges the court to rely on another canon of statutory construction. According to Leisnoi, because Congress designed ANCSA for the benefit of Native Americans, the statute should be construed in their favor. To be sure, some ambiguous provisions should be interpreted to the benefit of Tribes. *See, e.g., Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918) (noting "general

rule that statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians"). However, the canon can have no application to a case such as this one, in which the rights of Tribes are in conflict with one another. Although Leisnoi is suing Stratman, a non-Native, a judgment against Stratman would also curtail the rights of Native-owned Regional Corporations, who have title to subsurface estates elsewhere in Alaska. Moreover, we have previously held that this canon does not apply to ANCSA. *See Seldovia Native Ass'n*, 904 F.2d at 1342; *Haynes v. United States*, 891 F.2d 235, 239 (9th Cir.1989). *But see Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1294 (9th Cir.1996) (applying the canon), *rev'd, Alaska v. Native Village of Venetie Tribal Gov't*, —— U.S. ——, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998).

withholding consent, only on those lands "within the boundaries of a[ ] Native village."

Congress's use of two distinct phrases leads us to conclude that two different meanings were intended. *See* 2A Sutherland, *Statutory Construction* § 46.06 (5th ed. 1992 & Supp.1997) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). As the district court noted, "[h]ad Congress intended the consent term of subsection (f) to have general application, it would have chosen language requiring consent as to all patented lands, not the restrictive 'within the boundaries' language." In other words, if Congress wanted the consent requirement to apply to *all* patented lands instead of a mere *subset* of those lands, Congress would have simply written the proviso as follows: "Provided, That the right to explore, develop, or remove minerals from the subsurface estate in *all lands patented to any Village Corporation* shall be subject to the consent of the Village Corporation." Thus, we agree with the district court that, because Congress envisioned two different concepts, the boundaries of the Native village do not include *all* lands patented to the Village Corporation.

Other sections of ANCSA support this construction; they similarly contemplate a distinction between all lands patented and those lands within the boundaries of the Native village. Take, for example, the provision that makes certain federal land available for ANCSA patents by withdrawing it from the pool of land otherwise subject to appropriation under the public-land laws. *See* 43 U.S.C. § 1610. Significantly, this section withdraws *more* than those lands that lie within the boundaries of the Native villages. All told, it withdraws:

(A) The lands in each township that encloses all or part of any Native village . . .;

(B) The lands in each township that is contiguous to or corners on the township that encloses all or part of such Native village; and

(C) The lands in each township that is contiguous to or corners on a township containing lands withdrawn by paragraph (B) of this subsection.

43 U.S.C. § 1610(a)(1). The Native villages are located *solely* in the townships mentioned in Paragraph (A); no Native village lies within the townships described in Paragraphs (B) or (C). These additional townships are nevertheless available for patents to Village Corporations. Thus, § 1610 confirms that all lands "patent[ed]" is a broader concept than those lands "within the boundaries of [the] Native village."

Another example of how ANCSA contemplates a distinction between these two concepts is the statutory provision that authorizes Village Corporations to select the land they want patented to them. *See* 43 U.S.C. § 1611. This section reads in relevant part:

[T]he Village Corporation for each Native village . . . shall select . . . all of the township or townships in which any part of the village is located, *plus* an area that will make the total selection equal to the acreage to which the village is entitled. . . .

43 U.S.C. § 1611(a)(1) (emphasis added). Of course, the word "plus" implies that a Village Corporation is entitled to more area than those "townships in which any part of the village is located." Because a Village Corporation ends up with more land than that which underlies the Native village, the lands patented to a Village Corporation must be more expansive than the boundaries of the Native village.

Finally, ANCSA provides that, after a Village Corporation selects its land, the Secretary of the Interior shall issue to the corporation a patent to the surface estate in land, a portion of which lies outside the Native village:

The lands patented shall be the lands within the township or townships that enclose the Native village, *and any additional lands* selected by the Village Corporation from the surrounding townships withdrawn for the Native village. . . .

43 U.S.C. § 1613(b). To be sure, this patent includes more than the lands within the boundaries of the Native village. Not only does the total include all land within the townships enclosing the Native village, but also "any additional lands" from surrounding townships.

Thus, the text of ANCSA draws a clear distinction between the lands patented to the Village Corporation and the boundaries of the Native village. The land within the Native village is a subset of the total patented lands. Hence, when Congress wrote in § 14(f), "[t]hat the right to explore, develop, or remove minerals from the subsurface estate *in the lands within the boundaries of any Native village* shall be subject to the consent of the Village Corporation," Congress was not requiring consent for mining in "all patented lands." The plain language of the statute is unambiguous. The district court was correct to reject Leisnoi's contrary construction.

**B**

This conclusion, however, does not end our inquiry. We must still determine exactly where the boundaries lie. Although the preceding analysis indicates that the boundaries fall somewhere within the outer limits of the total patented lands, it does not help us decide their precise location. Are the boundaries marked by the Native village's historical use, as Leisnoi contends, or occupancy of the land, as Stratman contends?

Turning to this question, we learn that a federal agency has already interpreted the consent provision in ANCSA § 14(f). *See* 43 C.F.R. § 2651.2(b)(2). Pursuant to ANCSA § 25, which authorizes regulations necessary for carrying out the Act, *see* 43 U.S.C. § 1624, the Secretary of the Interior has established requirements that a village must meet before it can receive ANCSA land benefits. One of the requirements is that the village must have "an identifiable physical location *evidenced by occupancy* consistent with the Natives' own cultural patterns and life style." 43 C.F.R. § 2651.2(b)(2) (emphasis added). The mere existence of *an* "identifiable physical location" requirement is unremarkable; the statute itself anticipates each Native village will have a recognizable geographic location. *See, e.g.,* 43 U.S.C. § 1610(a)(1)(A) (withdrawing from public appropriation those "lands in each township that encloses all or part of any Native village"); 43 U.S.C. § 1611(a)(1) (permitting Village Corporation to select land from "the township or townships in which any part of the village is located"). What is relevant to

this appeal, we think, is *how* the Secretary determines this location. The Secretary identifies a Native village by looking for "*evidence[ ][of] occupancy* consistent with the Natives' own cultural patterns and life style." 43 C.F.R. § 2651.2(b)(2) (emphasis added). Thus, in the Secretary's view, the "boundaries of a[ ] Native village" are defined by reference to this physical evidence of occupancy.

Because the Secretary of the Interior bears "[t]he principal responsibility for administering [ANCSA]," his interpretations are entitled to "great weight" upon judicial review. *Doyon, Ltd. v. Bristol Bay Native Corp.,* 569 F.2d 491, 496 (9th Cir.1978); *see also Seldovia Native Ass'n,* 904 F.2d at 1342 ("[A]n administrative agency's interpretation of a statute it is charged with administering is accorded substantial deference."). We may not "simply impose [our] own construction on the statute" without regard to the Secretary's regulations. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Rather, we must defer to the Secretary unless his interpretation is inconsistent with the "unambiguously expressed intent of Congress" or is otherwise unreasonable. *Id.* at 842–43, 104 S.Ct. 2778.

**1**

Leisnoi contends that identifying the boundaries of a Native village by means of occupancy, as the Secretary has done, is indeed inconsistent with express congressional intent. According to Leisnoi, Congress provided a definition of "Native village" that unambiguously requires boundaries to be determined by the Tribe's historical use—not its occupancy—of the land:

> "Native village" means any *tribe, band, clan, group, village, community, or association* in Alaska listed in sections 1610 and 1615 of this title, or which meets the requirements of this chapter, and which the Secretary determines was … composed of twenty-five or more Natives.

43 U.S.C. § 1602(c) (emphasis added). Leisnoi argues that, because Congress used words such as "tribe, band, clan, group, village, community, [and] association," Con-

gress must have intended an expansive definition of "Native village," one which extends to the Natives' "entire community." From this premise, Leisnoi jumps to the conclusion that courts should define the "boundaries of a[ ] Native village" by referencing the areas in which the Natives historically hunted, fished, hiked, and camped.

We do not dispute Leisnoi's premise. At the risk of belaboring the obvious, the simple fact that Congress included "community" in its list of words defining a "Native village" indicates that the boundaries of the village extend over the "entire community." Nonetheless, there is a fatal flaw in Leisnoi's reasoning: the conclusion simply does not follow from the premise. There is no reason to believe that "community" must be defined by hiking and fishing instead of by occupancy. Indeed, the ordinary understanding of the word "community" might suggest that the opposite is true. Commonly defined, a "community" is a "people with common interests *living in a particular area.*" *Webster's Ninth New Collegiate Dictionary* 267 (1986) (emphasis added). Hence, contrary to Leisnoi's contention, ANCSA's definition of "Native village" is not evidence of congressional intent to determine boundaries by means of historical use; indeed, the definition may actually support the Secretary's understanding.

**2**

■ We thus inquire whether the Secretary's interpretation is otherwise "reasonable." *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778; *Seldovia Native Ass'n,* 904 F.2d at 1342. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778. Instead, we simply ask whether we are "compell[ed]" to reject the Secretary's construction. *See Alaska Wildlife Alliance v. Jensen,* 108 F.3d 1065, 1070 (9th Cir.1997) (internal quotations and citation omitted).

■ In this case, we are certainly not so compelled. ANCSA expressly contemplates that a Native village has a geographic "locat[ion]." *See* 43 U.S.C. § 1611(a)(1) (authorizing selection of land in "all of the town-ship or townships in which any part of the village is located"); *cf.* 43 U.S.C. § 1613(b) ("The lands patented shall be the lands within the township or townships that enclose the Native village, and any additional lands selected by the Village Corporation from the surrounding townships...."). In everyday usage, the "location" of a town, city, or village is "a position or site *occupied* or available for *occupancy* or marked by some distinguishing feature." *Webster's Ninth New Collegiate Dictionary* 701 (1986) (emphasis added); *see also Webster's Third New International Dictionary* 1327 (1986) (defining "location" as "a position or site occupied or available for *occupancy* (*as by a building*) or marked by some distinguishing feature") (emphasis added). Recognizing this ordinary understanding of the word "location," which is substantially identical to the Secretary's understanding, we would be hard pressed to say that the Secretary was unreasonable. Indeed, "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metropolitan Educ. Enters., Inc.,* 519 U.S. 202, 117 S.Ct. 660, 664, 136 L.Ed.2d 644 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). Without a contrary statutory definition to unsettle this assumption, the Secretary did not make an unreasonable choice by following the ordinary understanding of the word "location." *Cf. Louisiana–Pacific Corp. v. ASARCO Inc.,* 24 F.3d 1565, 1574 (9th Cir.1994) ("The reasonableness of this interpretation is demonstrated by our analysis of what we have concluded to be the plain meaning of the statute.").

Admittedly, in ANCSA, Congress may not have "*directly* addressed the precise question" of whether boundaries should be defined by occupancy or historical use; Congress's use of the word "locat[ion]" may be too casual to constitute an "unambiguous[ ] express[ion]" of intent, as required to disregard an agency interpretation. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (emphasis added). However, the commonly understood meaning of the word is indeed enough to render the

Secretary's regulation "a permissible construction of the statute." *Id.*

### a

Leisnoi nevertheless challenges this interpretation as unreasonable for three reasons. First, Leisnoi argues, demarcating boundaries by means of occupancy would render nugatory the consent provision insofar as the Native village of Woody Island is concerned. In other words, according to Leisnoi, if we adopt the Secretary's interpretation, the Native village of Woody Island would have *no* power to withhold consent and to preclude mining on *any* land. Leisnoi does not own the surface estate of the land on which the village's structures and dwellings are located; Leisnoi could not receive patents to such land because it lies within two miles of a "home rule" city, the City of Kodiak. 43 C.F.R. § 2650.6(a) ("Notwithstanding any other provisions of the act, no village or regional corporation may select lands which are within 2 miles from the boundary of any home rule or first-class city...."). Therefore, its argument goes, if Village Corporations may withhold consent *only* when they own the underlying surface estate, Leisnoi would have no power to withhold consent over any land.

 We need not decide whether Leisnoi's presumption—that the consent power is limited to land which the Village Corporation owns (as well as occupies)—is correct. Assuming it to be true, we hold that the Secretary's construction, which is consistent with if not recommended by the plain meaning of ANCSA, is nevertheless reasonable. Our conclusion might lead to perceived unfairness in a few rare situations, such as this one, but perfection is not to be expected from a statutory scheme such as ANCSA, which attempts to settle land claims in over 200 villages across the largest state in our Union. Moreover, under *Chevron,* an agency's interpretation of a statute need not be flawless to be reasonable. *See San Bernardino Mountains Community Hosp. Dist. v. Secretary of Health and Human Servs.,* 63 F.3d 882, 889 (9th Cir.1995); *see also Appalachian Regional Healthcare, Inc. v. Shalala,* 131 F.3d 1050, 1054 (D.C.Cir.1997) (Sentelle, J., dissenting) ("We are all in agreement that to survive the two-step analysis drawn from [*Chevron* ], the Board's ruling ... need not be perfect, or

even the best, but only reasonable."). We therefore reject Leisnoi's first argument.

### b

 Leisnoi's second argument is that the Secretary's interpretation is inconsistent with legislative history. We disagree. The passage Leisnoi cites, an excerpt of a House Report, is inconclusive:

> Section 14(f) of the Settlement Act provides that the right to explore, develop, or remove minerals from the subsurface estate in the lands within the boundaries of any Native village are to be subject to the consent of the Village Corporation. This provision provides protection to villages from a precipitate decision by Regional Corporations to develop the subsurface estate. This provision seeks to avoid potential conflicts between *villages which are holders of the surface estate and which may be made concerned with preserving the use of the land in accordance with traditional local life-styles and subsistence economy* and Regional Corporations which are holders of the subsurface estate and which may have as their focus the generation of revenues from the land.

H. Rep. No. 94–729, at 26 (1975), *reprinted in* 1975 U.S.C.C.A.N. 2376, 2393 (emphasis added). As this court has emphasized, the use of legislative history as a tool for statutory interpretation suffers from a host of infirmities: not only is legislative history "not passed by both houses of Congress and signed into law by the President," but it also "need not be written with the same care, or scrutinized by those skeptical of the statute with the same care, as statutory language." *See Puerta v. United States* 121 F.3d 1338, 1344 (9th Cir.1997); *see also Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring in judgment) (analogizing use of legislative history to "entering a crowded cocktail party and looking over the heads of the guests for one's friends"). Reliance on such history is particularly suspect when it is inconsistent with the ordinary understanding of the words in the statute and an otherwise reasonable agency interpretation.

In any event, the language to which Leisnoi points is ambiguous and arguably consistent with the Secretary's interpretation of the statute. The House Report simply expresses a desire to allow Village Corporations to "preserv[e] the use of *the land* in accordance with traditional local life-styles and subsistence economy." The Report does not identify this land, aside from the fact that it is "within the boundaries of a[ ] Native village." In other words, the Report does not indicate whether the land referenced is all land historically used (for fishing, hiking, etc.) or only land on which occupancy structures have been built. Because the legislative history is unclear, it cannot displace the Secretary's understanding of the text of the statute.

### c

Finally, Leisnoi contends that the Secretary's interpretation is in tension with a "Congressional policy of fostering economic growth." In the preamble of the statute, Congress proclaimed that the ANCSA land settlement "should be accomplished ... in conformity with the real economic ... needs of Natives." 43 U.S.C. § 1601(b). Leisnoi asserts in its brief that defining boundaries by occupancy stifles this policy: Surface estates would "effectively be rendered unmarketable and off-limits to any construction of homes or improvements, since subsurface owners could at any time dig out beneath the foundations of any improvements to exercise what the district court granted as an unfettered right to extract sand and gravel without notice and consent." We are unpersuaded for two reasons. First, we do not reach the question of whether Alaska property law precludes mining activity that unreasonably interferes with the rights of surface-estate owners. Second, surface and subsurface-estate owners can, of course, resolve potential future disputes by way of contract. *Cf. Alaska v. Native Village of Venetie Tribal Gov't*, — U.S. —, 118 S.Ct. 948, 951, 140 L.Ed.2d 30 (1998) (noting that ANCSA does not restrict land transfers by Village or Regional Corporations). Theoretically, at least, given a world of no transaction costs, economic optimality does not depend on the allocation of a property right (such as the power to authorize mining) to one party or another; the two parties can simply bargain to the optimal solution. *See* R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1, 2–15 (1960). Assuredly, theory might not survive practice; however, the determinations of whether theory prevails and, if not, whether economic growth is maximized by granting the property right to the surface-estate owner, instead of the subsurface-estate owner, should not be made by the judiciary. We are ill-equipped to hypothesize on the consequences of imperfect information or other impediments to bargaining.[8] "Such policy arguments are more properly addressed to legislators or administrators ..." *Chevron*, 467 U.S. at 864, 104 S.Ct. 2778. Because "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest" are best left to the elected branches of government, *id.* at 866, 104 S.Ct. 2778, we do not hold the Secretary's interpretation unreasonable. The "boundaries of a[ ] Native village" are defined by occupancy, not historical use.

### III

Implementing this test, we simply examine whether the Native village of Woody Island has demonstrated evidence of occupancy on Kodiak Island. It has not. When the Native village applied for land benefits in 1973, pursuant to the Secretary's regulations, it reported its "locat[ion]"—defined by occupancy structures—as follows:

> The Native Village of Woody Island is located within Townships: T27S and T28S, Range 19W, Seward Meridian, Alaska, as shown on the enclosed map.

These townships, the map reveals, are on Woody Island, not Kodiak Island. The Bureau of Indian Affairs confirmed this location later that year. Although it is conceivable that—through normal village expansion—a Native village's boundaries might today be different from what they were in 1973, that is not the case here. Leisnoi has never suggested that the village has expanded to occu-

---

**8.** For an analysis of obstacles to bargaining and their economic effects, see generally Robert C.

Ellickson, *The Case for Coase and Against "Coaseanism"*, 99 Yale L.J. 611 (1989).

py Kodiak Island. Thus, Stratman, having already received a deed from Koniag, does not need Leisnoi's additional consent to proceed with his mining there. The district court did not err in granting the Rule 12(b)(6) dismissal.

**AFFIRMED.**