# ALASKA *v.* NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT ET AL.

No. 96–1577.   Argued December 10, 1997—Decided February 25, 1998

THOMAS, J., delivered the opinion for a unanimous Court.

*John G. Roberts, Jr.,* argued the cause for petitioner. With him on the briefs were *Gregory G. Garre, Bruce M. Botelho,* Attorney General of Alaska, *Barbara J. Ritchie,* Deputy Attorney General, and *D. Rebecca Snow* and *Elizabeth J. Barry,* Assistant Attorneys General.

*Heather R. Kendall-Miller* argued the cause for respondents. With her on the brief was *Lloyd Benton Miller.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, and *Thomas F. Gede,* Special Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Grant Woods* of Arizona, *Gale A. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Jim Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Richard P. Ieyoub* of Louisiana, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Mike Moore* of Mississippi, *Jeremiah (Jay) W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Mike Fisher* of Pennsylvania, *Betty D. Montgomery* of Ohio, *Jeffrey B. Pine* of Rhode Island, *Mark Barnett* of South Dakota, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *William U. Hill* of Wyoming;

JUSTICE THOMAS delivered the opinion of the Court.

In this case, we must decide whether approximately 1.8 million acres of land in northern Alaska, owned in fee simple by the Native Village of Venetie Tribal Government pursuant to the Alaska Native Claims Settlement Act, is "Indian country." We conclude that it is not, and we therefore reverse the judgment below.

## I

The Village of Venetie, which is located in Alaska above the Arctic Circle, is home to the Neets'aii Gwich'in Indians. In 1943, the Secretary of the Interior created a reservation for the Neets'aii Gwich'in out of the land surrounding Venetie and another nearby tribal village, Arctic Village. See App. to Pet. for Cert. 2a. This land, which is about the size of Delaware, remained a reservation until 1971, when Congress enacted the Alaska Native Claims Settlement Act (ANCSA), a comprehensive statute designed to settle all land claims by Alaska Natives. See 85 Stat. 688, as amended, 43 U. S. C. § 1601 et seq.

In enacting ANCSA, Congress sought to end the sort of federal supervision over Indian affairs that had previously

for the Alaska Fish & Wildlife Federation and Outdoor Council, Inc., et al. by *James Martin Johnson* and *Gregory Frank Cook;* and for the Council of State Governments et al. by *Richard Ruda, Charles F. Lettow,* and *Michael R. Lazerwitz.*

Briefs of *amici curiae* urging affirmance were filed for the Navajo Nation et al. by *Paul E. Frye, Judith K. Bush,* and *James R. Bellis;* for the Tanana Chiefs Conference by *Bertram E. Hirsch, Michael J. Walleri, Bruce J. Ennis, Jr.,* and *Thomas Perrelli;* for Koniag, Inc., by *R. Collin Middleton, William H. Timme,* and *Timothy W. Seaver;* and for Indian Law Professors by *Richard B. Collins, David H. Getches, Raphael J. Moses, Robert N. Clinton, Carole E. Goldberg,* and *Ralph W. Johnson.*

Briefs of *amici curiae* were filed for the Alaska Federation of Natives et al. by *Arlinda F. Locklear, David S. Case, Carol H. Daniel, Douglas Pope, Hans Walker, Jr.,* and *Marsha Kostura Schmidt;* for the Metlakatla Indian Community by *S. Bobo Dean* and *Marsha Kostura Schmidt;* and for Shee Atika, Inc., by *Bruce N. Edwards.*

marked federal Indian policy. ANCSA's text states that the settlement of the land claims was to be accomplished

> "without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, [and] *without creating a reservation system or lengthy wardship or trusteeship.*" § 1601(b) (emphasis added).

To this end, ANCSA revoked "the various reserves set aside . . . for Native use" by legislative or Executive action, except for the Annette Island Reserve inhabited by the Metlakatla Indians, and completely extinguished all aboriginal claims to Alaska land. §§ 1603, 1618(a). In return, Congress authorized the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations that were to be formed pursuant to the statute; all of the shareholders of these corporations were required to be Alaska Natives. §§ 1605, 1607, 1613. The ANCSA corporations received title to the transferred land in fee simple, and no federal restrictions applied to subsequent land transfers by them.

Pursuant to ANCSA, two Native corporations were established for the Neets'aii Gwich'in, one in Venetie, and one in Arctic Village. In 1973, those corporations elected to make use of a provision in ANCSA allowing Native corporations to take title to former reservation lands set aside for Indians prior to 1971, in return for forgoing the statute's monetary payments and transfers of nonreservation land. See § 1618(b). The United States conveyed fee simple title to the land constituting the former Venetie Reservation to the two corporations as tenants in common; thereafter, the corporations transferred title to the land to the Native Village of Venetie Tribal Government (Tribe).

In 1986, the State of Alaska entered into a joint venture agreement with a private contractor for the construction of a public school in Venetie, financed with state funds. In December 1986, the Tribe notified the contractor that it owed the Tribe approximately $161,000 in taxes for conducting business activities on the Tribe's land. When both the contractor and the State, which under the joint venture agreement was the party responsible for paying the tax, refused to pay, the Tribe attempted to collect the tax in tribal court from the State, the school district, and the contractor.

The State then filed suit in Federal District Court for the District of Alaska and sought to enjoin collection of the tax. The Tribe moved to dismiss the State's complaint, but the District Court denied the motion. It held that the Tribe's ANCSA lands were not Indian country within the meaning of 18 U. S. C. § 1151(b), which provides that Indian country includes all "dependent Indian communities within the borders of the United States"; as a result, "the Trib[e] [did] not have the power to impose a tax upon non-members of the tribe such as the plaintiffs." *Alaska ex rel. Yukon Flats School Dist.* v. *Native Village of Venetie Tribal Government,* No. F87–0051 CV (HRH) (D. Alaska, Aug. 2, 1995), App. to Pet. for Cert. 79a.

The Court of Appeals for the Ninth Circuit reversed. 101 F. 3d 1286 (1996). The Court held that a six-factor balancing test should be used to interpret the term "dependent Indian communities" in § 1151(b), see *id.,* at 1292–1293, and it summarized the requirements of that test as follows:

> "[A] dependent Indian community requires a showing of federal set aside and federal superintendence. These requirements are to be construed broadly and should be informed in the particular case by a consideration of the following factors:
>
> "(1) the nature of the area; (2) the relationship of the area inhabitants to Indian tribes and the federal government; (3) the established practice of government agen-

cies toward that area; (4) the degree of federal ownership of and control over the area; (5) the degree of cohesiveness of the area inhabitants; and (6) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples." *Id.*, at 1294.

Applying this test, the Court of Appeals concluded that the "federal set aside" and "federal superintendence" requirements were met and that the Tribe's land was therefore Indian country. *Id.*, at 1300–1302.

Judge Fernandez wrote separately. In his view, ANCSA was intended to be a departure from traditional Indian policy: "It attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land; it attempted to leave them as sovereign entities for some purposes, but as sovereigns without territorial reach." *Id.*, at 1303. Noting that the majority's holding called into question the status of all 44 million acres of land conveyed by ANCSA, he wrote that "[w]ere we writing on a clean slate, I would eschew the tribe's request and would avoid creating the kind of chaos that the 92nd Congress wisely sought to avoid." *Id.*, at 1304. He nonetheless concluded that Ninth Circuit precedent required him to concur in the result. *Ibid.* We granted certiorari to determine whether the Court of Appeals correctly determined that the Tribe's land is Indian country. 521 U. S. 1103 (1997).

II

A

"Indian country" is currently defined at 18 U. S. C. § 1151. In relevant part, the statute provides:

"[T]he term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . , (b) all dependent Indian communities within the borders of

the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

Although this definition by its terms relates only to federal criminal jurisdiction, we have recognized that it also generally applies to questions of civil jurisdiction such as the one at issue here. See *DeCoteau* v. *District County Court for Tenth Judicial Dist.*, 420 U. S. 425, 427, n. 2 (1975).[1]

Because ANCSA revoked the Venetie Reservation, and because no Indian allotments are at issue, whether the Tribe's land is Indian country depends on whether it falls within the "dependent Indian communities" prong of the statute, § 1151(b).[2] Since 18 U. S. C. § 1151 was enacted in 1948, we have not had an occasion to interpret the term "dependent Indian communities." We now hold that it refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence. Our holding is based on our conclusion that in enacting § 1151, Congress codified these two requirements, which previously we had held necessary for a finding of "Indian country" generally.

---

[1] Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States. See, *e. g., South Dakota* v. *Yankton Sioux Tribe, ante,* at 343.

[2] As noted, only one Indian reservation, the Annette Island Reserve, survived ANCSA. Other Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a "dependent Indian communit[y]" under our interpretation of § 1151(b), or if it constitutes "allotments" under § 1151(c).

Before § 1151 was enacted, we held in three cases that Indian lands that were not reservations could be Indian country and that the Federal Government could therefore exercise jurisdiction over them. See *United States* v. *Sandoval,* 231 U. S. 28 (1913); *United States* v. *Pelican,* 232 U. S. 442 (1914); *United States* v. *McGowan,* 302 U. S. 535 (1938).[3] The first of these cases, *United States* v. *Sandoval,* posed the question whether the Federal Government could constitutionally proscribe the introduction of "intoxicating liquor" into the lands of the Pueblo Indians. 231 U. S., at 36. We rejected the contention that federal power could not extend to the Pueblo lands because, unlike Indians living on reservations, the Pueblos owned their lands in fee simple. *Id.,* at 48. We indicated that the Pueblos' title was not fee simple title in the commonly understood sense of the term. Congress had recognized the Pueblos' title to their ancestral lands by statute, and Executive orders had reserved additional public lands "for the [Pueblos'] use and occupancy." *Id.,* at 39. In addition, Congress had enacted legislation with respect to the lands "in the exercise of the Government's guardianship over th[e] [Indian] tribes and their affairs," *id.,* at 48, including federal restrictions on the lands' alienation.[4] Congress therefore could exercise jurisdiction over the Pueblo lands, under its general power over "all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a State." *Id.,* at 46.

---

[3] We had also held, not surprisingly, that Indian reservations were Indian country. See, *e. g., Donnelly* v. *United States,* 228 U. S. 243, 269 (1913).

[4] One such law was Rev. Stat. § 2116, 25 U. S. C. § 177, which rendered invalid any conveyance of Indian land not made by treaty or convention entered into pursuant to the Constitution, and which we later held applicable to the Pueblos. See *United States* v. *Candelaria,* 271 U. S. 432, 441–442 (1926).

In *United States* v. *Pelican,* we held that Indian allotments—parcels of land created out of a diminished Indian reservation and held in trust by the Federal Government for the benefit of individual Indians—were Indian country. 232 U. S., at 449. We stated that the original reservation was Indian country "simply because *it had been validly set apart for the use of the Indians as such, under the superintendence of the Government." Ibid.* (emphasis added). After the reservation's diminishment, the allotments continued to be Indian country, as "the lands remained Indian lands set apart for Indians under governmental care; . . . we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the Government retaining control." *Ibid.*

In *United States* v. *McGowan,* we held that the Reno Indian Colony in Reno, Nevada, was Indian country even though it was not a reservation. 302 U. S., at 539. We reasoned that, like Indian reservations generally, the colony had been " 'validly set apart for the use of the Indians . . . under the superintendence of the Government.'" *Ibid.* (quoting *United States* v. *Pelican, supra,* at 449) (emphasis deleted). We noted that the Federal Government had created the colony by purchasing the land with "funds appropriated by Congress" and that the Federal Government held the colony's land in trust for the benefit of the Indians residing there. 302 U. S., at 537, and n. 4. We also emphasized that the Federal Government possessed the authority to enact "regulations and protective laws respecting th[e] [colony's] territory," *id.,* at 539, which it had exercised in retaining title to the land and permitting the Indians to live there. For these reasons, a federal statute requiring the forfeiture of automobiles carrying "intoxicants" into the Indian country applied to the colony; we noted that the law was an example of the protections that Congress had extended to all " 'dependent Indian communities'" within the territory of the United

States. *Id.*, at 538 (quoting *United States* v. *Sandoval, supra,* at 46) (emphasis deleted).

In each of these cases, therefore, we relied upon a finding of both a federal set-aside and federal superintendence in concluding that the Indian lands in question constituted Indian country and that it was permissible for the Federal Government to exercise jurisdiction over them. Section 1151 does not purport to alter this definition of Indian country, but merely lists the three different categories of Indian country mentioned in our prior cases: Indian reservations, see *Donnelly* v. *United States,* 228 U. S. 243, 269 (1913); dependent Indian communities, see *United States* v. *McGowan, supra,* at 538–539; *United States* v. *Sandoval, supra,* at 46; and allotments, see *United States* v. *Pelican, supra,* at 449. The entire text of § 1151(b), and not just the term "dependent Indian communities," is taken virtually verbatim from *Sandoval,* which language we later quoted in *McGowan.* See *United States* v. *Sandoval, supra,* at 46; *United States* v. *McGowan, supra,* at 538. Moreover, the Historical and Revision Notes to the statute that enacted § 1151 state that § 1151's definition of Indian country is based "on [the] latest construction of the term by the United States Supreme Court in *U. S. v. McGowan* . . . following *U. S. v. Sandoval.* (See also *Donnelly v. U. S.*) . . . . Indian allotments were included in the definition on authority of the case of *U. S. v. Pelican.*" See Notes to 1948 Act, following 18 U. S. C. § 1151, p. 276 (citations omitted).

We therefore must conclude that in enacting § 1151(b), Congress indicated that a federal set-aside *and* a federal superintendence requirement must be satisfied for a finding of a "dependent Indian community"—just as those requirements had to be met for a finding of Indian country before 18 U. S. C. § 1151 was enacted.[5] These requirements are re-

---

[5] In attempting to defend the Court of Appeals' judgment, the Tribe asks us to adopt a different conception of the term "dependent Indian communities." Borrowing from Chief Justice Marshall's seminal opinions

flected in the text of § 1151(b): The federal set-aside requirement ensures that the land in question is occupied by an "Indian community";[6] the federal superintendence requirement guarantees that the Indian community is sufficiently "dependent" on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question.[7]

in *Cherokee Nation* v. *Georgia,* 5 Pet. 1 (1831), and *Worcester* v. *Georgia,* 6 Pet. 515 (1832), the Tribe argues that the term refers to *political* dependence, and that Indian country exists wherever land is owned by a federally recognized tribe. Federally recognized tribes, the Tribe contends, are "domestic dependent nations," *Cherokee Nation* v. *Georgia, supra,* at 17, and thus *ipso facto* under the superintendence of the Federal Government. See Brief for Respondents 23–24.

This argument ignores our Indian country precedents, which indicate both that the Federal Government must take some action setting apart the land for the use of the Indians "as such," and that it is *the land in question,* and not merely the Indian tribe inhabiting it, that must be under the superintendence of the Federal Government. See, *e. g., United States* v. *McGowan,* 302 U. S. 535, 539 (1938) ("The Reno Colony has been validly set apart for the use of the Indians. It is under the superintendence of the Government. The Government retains title to the lands which it permits the Indians to occupy"); *United States* v. *Pelican,* 232 U. S. 442, 449 (1914) (noting that the Federal Government retained "ultimate control" over the allotments in question).

[6] The federal set-aside requirement also reflects the fact that because Congress has plenary power over Indian affairs, see U. S. Const., Art. I, § 8, cl. 3, some explicit action by Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country.

[7] Although the Court of Appeals majority also reached the conclusion that § 1151(b) imposes federal set-aside and federal superintendence requirements, it defined those requirements far differently, by resort to its "textured" six-factor balancing test. See 101 F. 3d 1286, 1293 (CA9 1996). Three of those factors, however, were extremely far removed from the requirements themselves: "the nature of the area"; "the relationship of the area inhabitants to Indian tribes and the federal government"; and "the degree of cohesiveness of the area inhabitants." *Id.,* at 1300–1301. The Court of Appeals majority, however, accorded those factors virtually

B

The Tribe's ANCSA lands do not satisfy either of these requirements. After the enactment of ANCSA, the Tribe's lands are neither "validly set apart for the use of the Indians as such," nor are they under the superintendence of the Federal Government.

With respect to the federal set-aside requirement, it is significant that ANCSA, far from designating Alaskan lands for Indian use, revoked the existing Venetie Reservation, and indeed revoked all existing reservations in Alaska "*set aside* by legislation or by Executive or Secretarial Order *for Native use*," save one. 43 U. S. C. § 1618(a) (emphasis added). In no clearer fashion could Congress have departed from its traditional practice of setting aside Indian lands. Cf. *Hagen* v. *Utah*, 510 U. S. 399, 401 (1994) (holding that by diminishing a reservation and opening the diminished lands to settlement by non-Indians, Congress had extinguished Indian country on the diminished lands).

The Tribe argues—and the Court of Appeals majority agreed, see 101 F. 3d, at 1301–1302—that the ANCSA lands were set apart for the use of the Neets'aii Gwich'in, "as such," because the Neets'aii Gwich'in acquired the lands pursuant to an ANCSA provision allowing Natives to take title to former reservation lands in return for forgoing all other ANCSA transfers. Brief for Respondents 40–41 (citing 43 U. S. C. § 1618(b)). The difficulty with this contention is that ANCSA transferred reservation lands to private, state-chartered Native corporations, without any restraints on alienation or significant use restrictions, and with the goal of avoiding "any permanent racially defined institutions, rights,

---

the same weight as other, more relevant ones: "the degree of federal ownership of and control over the area," and "the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples." *Id.*, at 1301. By balancing these "factors" against one another, the Court of Appeals reduced the federal set-aside and superintendence requirements to mere considerations.

privileges, or obligations." § 1601(b); see also §§ 1607, 1613. By ANCSA's very design, Native corporations can immediately convey former reservation lands to non-Natives, and such corporations are not restricted to using those lands for Indian purposes. Because Congress contemplated that non-Natives could own the former Venetie Reservation, and because the Tribe is free to use it for non-Indian purposes, we must conclude that the federal set-aside requirement is not met. Cf. *United States* v. *McGowan*, 302 U. S., at 538 (noting that the land constituting the Reno Indian Colony was held in trust by the Federal Government for the benefit of the Indians); see also *United States* v. *Pelican*, 232 U. S., at 447 (noting federal restraints on the alienation of the allotments in question).

Equally clearly, ANCSA ended federal superintendence over the Tribe's lands. As noted above, ANCSA revoked the Venetie Reservation along with every other reservation in Alaska but one, see 43 U. S. C. § 1618(a), and Congress stated explicitly that ANCSA's settlement provisions were intended to avoid a "lengthy wardship or trusteeship." § 1601(b). After ANCSA, federal protection of the Tribe's land is essentially limited to a statutory declaration that the land is exempt from adverse possession claims, real property taxes, and certain judgments as long as it has not been sold, leased, or developed. See § 1636(d). These protections, if they can be called that, simply do not approach the level of superintendence over the Indians' land that existed in our prior cases. In each of those cases, the Federal Government actively controlled the lands in question, effectively acting as a guardian for the Indians. See *United States* v. *McGowan*, *supra*, at 537–539 (emphasizing that the Federal Government had retained title to the land to protect the Indians living there); *United States* v. *Pelican, supra,* at 447 (stating that the allotments were "under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians"); *United States*

v. *Sandoval*, 231 U. S., at 37, n. 1 (citing federal statute plac-
ing the Pueblos' land under the "'absolute jurisdiction and
control of the Congress of the United States'"). Finally, it
is worth noting that Congress conveyed ANCSA lands to
state-chartered and state-regulated private business corpo-
rations, hardly a choice that comports with a desire to retain
*federal* superintendence over the land.

The Tribe contends that the requisite federal superintend-
ence is present because the Federal Government provides
"desperately needed health, social, welfare, and economic
programs" to the Tribe. Brief for Respondents 28. The
Court of Appeals majority found this argument persuasive.
101 F. 3d, at 1301. Our Indian country precedents, however,
do not suggest that the mere provision of "desperately
needed" social programs can support a finding of Indian
country. Such health, education, and welfare benefits are
merely forms of general federal aid; considered either alone
or in tandem with ANCSA's minimal land-related protec-
tions, they are not indicia of active federal control over
the Tribe's land sufficient to support a finding of federal
superintendence.

The Tribe's federal superintendence argument, moreover,
is severely undercut by its view of ANCSA's primary pur-
poses, namely, to effect Native self-determination and to end
paternalism in federal Indian relations. See, *e. g.*, Brief for
Respondents 44 (noting that ANCSA's land transfers "fos-
ter[ed] greater tribal self-determination" and "renounc[ed]
[Bureau of Indian Affairs] paternalism"). The broad federal
superintendence requirement for Indian country cuts against
these objectives, but we are not free to ignore that require-
ment as codified in 18 U. S. C. § 1151. Whether the concept
of Indian country should be modified is a question entirely
for Congress.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*