HOWARD, Circuit Judge,
dissenting.
Respectfully, I disagree with the majority’s analysis of the Settlement Act. In my view, the majority opinion disregards Congress’s (and the parties’) purpose in passing the Settlement Act and is inconsistent with our own recent interpretation of the Settlement Act. See Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16 (1st Cir.2006) (en banc). At bottom, under the Settlement Act, the Secretary may only take the Parcel into a restricted trust[25] that provides for Rhode Island’s continued criminal and civil jurisdiction over the Parcel. The State makes this argument in two forms. First, by arguing that the Settlement Act effectuates a partial implied repeal of the IRA as to state jurisdiction on land taken into trust by the BIA. Second, by arguing that the statutes can be harmonized by reading the IRA narrowly and subject to the Settlement Act’s provisions. Either approach gets to the same conclusion. Significantly, the generous rules of “Indian construction” do not apply in analyzing an implied repeal. See Passamaquoddy Tribe v. State of Maine, 75 F.3d 784, 790 (1st Cir.1996) (the normal principles of implied repeal are applied in the Indian law context).
The parties and amici do an excellent job in acquainting the court with the many complexities of both the case and the issues inherent in “Indian law.” However, the ultimate resolution of the case comes down to a very narrow question: In the specific context of the Tribe and State, what did Congress intend the Settlement Act to do?
The key provision is Section 1705, which is written far more broadly than the majority concludes.[26] In its first two provisions that section retroactively ratifies all the Tribe’s prior land transfers anywhere in the United States and extinguishes the Tribe’s aboriginal title in all such lands. See 25 U.S.C. § 1705(a)(1) & (2). More significantly, Section 1705 goes on to extinguish future land claims:
(3)by virtue of the approval of a transfer of land or natural resources effected by this section, or an extinguishment of aboriginal title effected thereby, all claims against the United States, any State or subdivision thereof, or any other person or entity, by the Indian Corporation or *49 any other entity presently or at any time in the past known as the Narragansett Tribe of Indians, or any predecessor or successor in interest, member of stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished as of the date of the transfer.
Id. § 1705(a)(3). This provision obviously goes well beyond merely extinguishing aboriginal title (and claims based thereon), which was accomplished in the prior subsection. See id. § 1705(a)(2). This language forecloses any future “Indian” land claim of any type by the Tribe regarding land in Rhode Island (or anywhere in the United States, for that matter). Thus, Congress (and the parties) intended to resolve all the Tribe’s land claims in the state once and for all.
The majority argues that Section 1705(a)(3) cannot be read so broadly; otherwise, the Tribe would be barred from asserting any land claims. See ante, at 36-37. But the majority disregards a significant factor — the nature of the land claims that were barred. The legislative history of the Settlement Act specifically states that the “extinguishment of Indian land claims is limited to those claims raised by Indians qua Indians.” H.R. Rep. 95-1453, U.S.Code Cong. & Admin.News 1978, 1948, at 1955 (1978) (emphasis added). As we recently stated, through the Settlement Act “the Tribe abandoned any right to an autonomous enclave, submitting itself to state law as a quid pro quo for obtaining the land that it cherished.” Narragansett Tribe, 449 F.3d at 22. Thus, the Tribe would be free to assert any claim that any other landowner in Rhode Island could make under state law, but would be foreclosed from making claims based entirely on the Tribe’s status as an Indian tribe. It is beyond peradventure that asking to have land taken into trust by the BIA under the IRA to effect an ouster of state jurisdiction is a quintessential “Indian” land claim.[27]
Moreover, “Congress does not legislate in a vacuum,” and among the matters that a court must consider in assessing a statute are general policies and pre-existing statutory provisions. Passamaquoddy Tribe, 75 F.3d at 789. The Settlement Act was enacted over 40 years after Section 465 of the IRA and, given the explicit acknowledgment of possible future recognition for the Tribe,[28] Congress was well aware of the IRA when enacting the Settlement Act. It is neither logical nor necessary to find that Congress enacted legislation effectuating this carefully calibrated compromise between three sovereigns, which required significant expenditures by both the federal government and the State, which provided a significant amount of land to the Tribe, and which provided for a delicate balancing of the parties’ interests, only to permit the legislation to be completely subverted by subsequent agency action.
On this score, the majority misses the exquisite irony that the Parcel was part of the lands originally claimed by the Tribe. It would be antithetical to Congress’ intent *50 to allow the Tribe to purchase a portion of the originally disputed lands that were the subject of the earlier lawsuits that ultimately led to the JMOU and Settlement Act, place it in trust with the BIA, and thereby create “Indian country” in direct contravention of the Settlement Act’s prohibitions. For this same reason, the majority’s attempt to distinguish our recent Narragansett Tribe opinion as pertaining only to the “Settlement Lands” is unpersuasive. See ante, at 34 n. 11. By that reasoning, the Tribe could swap the Settlement Lands for adjacent land and undo any limitations contained in the Settlement Act. The Settlement Act cannot be reasonably construed to allow such absurd results.
Further, the Settlement Act was novel; it was the first statute resolving Indian land claims, premised upon the Noninter-course Act, growing out of an out-of-court settlement negotiated by a tribe and the state/landowners. See H.R. 95-1453, at 1951 (1978). Indeed, it was expected to serve as a template for the resolution of other' Eastern tribes’ land claims under the Nonintercourse Act. See id.; see also Oneida Indian Nation, 125 S.Ct. at 1483-85 (discussing Nonintercourse Act and original 13 states’ “pre-emptive right to purchase from the Indians”). In light of the fact that the Settlement Act was the first statute of its kind, the majority’s observation that subsequent statutes were more explicit in limiting certain aspects of the Secretary’s power proves nothing. Elaborate statements regarding the Tribe’s relationship with the BIA would have been unwarranted in the Settlement Act, given that the Tribe had not yet been recognized.
' Moreover, that subsequent acts dealing with Eastern tribes made specific provision for the Secretary’s ability to take land in trust for a tribe, see, e.g., 25 U.S.C. § 1771d(c) & (d) (Massachusetts Indian Claims Settlement); id. § 1724(d) (Maine Indian Claims Settlement); id. § 1754(b) (Connecticut Indian Claims Settlement), supports the conclusion that Congress anticipated no such result under the Settlement Act. Given that the State had full criminal and civil jurisdiction over its territory, that any potential jurisdictional issue concerning the Settlement Lands was specifically addressed, and that all future Indian land claims were barred, there would be no future land scenarios that Congress would need to address more specifically (as it' did in the other acts).[29] As we have noted, “the Settlement Act, properly read, ensures that the State may demand the Tribe’s compliance with state laws of general application.” Narragansett Tribe, 449 F.3d at 26.
There is also nothing novel about requiring the BIA to accept the Parcel into trust with restrictions. The BIA is authorized to take restricted interests in land into trust, see 25 U.S.C. § 465, and, in dealing with other tribes, Congress has specifically directed the BIA to take land into trust subject to a settlement act’s provisions, see, e.g., id. § 1771d(d); id. § 1773b.
It is also worth noting that Congress acted promptly to preserve the State’s jurisdiction over the Tribe’s lands the last time this court challenged it. When this court held that the Tribe exercised suffi- *51 dent jurisdiction and governmental authority over the Settlement Lands to invoke the Indian Regulatory Gaming Act, see Narragansett Tribe, 19 F.3d at 703, Congress promptly amended the Settlement Act to provide explicitly that the Settlement Lands are not “Indian lands” for purposes of that Act, see 25 U.S.C. § 1708(b).
I respectfully dissent.

. I do not challenge the majority's conclusion that the BIA may take the Parcel into trust, as the State previously permitted the Narragansetts to take the Settlement Lands into trust in 1988. But any new trust lands must also be explicitly made subject to the State’s criminal and civil laws.

. Indeed, the very breadth of the language indicates more was contemplated by the parties than merely resolving an immediate dispute over title.

. The Tribe would still have the option of obtaining the State’s consent to make certain Indian land claims — such as the 1988 placement of the settlement lands in trust (subject to Rhode Island law) with the BIA.

. The Tribe’s recognition by the BIA changed little, as this court has held that the jurisdictional grant to the State in the Settlement Act survived such recognition. See Narragansett Indian Tribe, 19 F.3d at 694-95.

. In extinguishing the Tribe’s aboriginal title in the Settlement Act, Congress was inspired by the Alaska Native Claims Settlement Act (“ANCSA”). See H.R. Rep. 95-1453, at 1951. As noted by the Supreme Court, the ANCSA sought to accomplish this goal “without creating a reservation system or lengthy wardship or trusteeship.” Alaska v. Native Village of Venetie Tribal Govt., 522 U.S. 520, 524, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998) (internal citation and quotation omitted).