IN THE OREGON TAX COURT
MAGISTRATE DIVISION

Allen FOREMAN
and Teresa Foreman,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC-MD 040844D)

Shayleen T. Idrogo, Chiloquin, filed the motion and argued the cause for Plaintiffs.

Wendy E. Sanderson, Assistant Attorney General, Department of Justice, Salem, filed the motion for Defendant.

Robert W. Muir, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant.

Decision for Defendant rendered May 16, 2005.

**JILL A. TANNER, Presiding Magistrate.**

Plaintiffs appeal Defendant's Notices of Assessment for tax years 2001and 2002. This matter is before the court on the parties' cross-motions for summary judgment. Oral argument was held on Tuesday, March 8, 2005, in the courtroom of the Oregon Tax Court, Salem, Oregon.

## I. STATEMENT OF FACTS

There is no material dispute of fact and the parties stipulated to the following:

Plaintiffs, husband and wife, live in Klamath County. Plaintiff, Allen Foreman (Foreman), is an enrolled member of the Klamath Indian Tribe, a federally recognized American Indian tribe.

Plaintiffs live on property (Property) that prior to December 11, 1958, was federally recognized Indian country in Oregon. The original owner of the Property, an enrolled member of the Klamath Indian Tribe, was granted a trust allotment from the United States on March 15, 1939. In 1958, the United States removed all federal restrictions and trust status from the Property, granting the owner "fee status" title to the Property. On January 21, 1998, the Property was deeded to Plaintiffs, passing the "fee status" title of the Property to Plaintiffs.

Foreman derived all of his income in tax years 2001 and 2002 from sources within the boundaries of federally recognized Indian country in Oregon. Plaintiffs allege that all of the income of plaintiff Allen Foreman is exempt from state income tax under ORS 316.777 for tax years 2001 and 2002. Defendant disagrees, stating that because Plaintiffs do not reside in Indian country, plaintiff Foreman's income is not exempt under state or federal law.

## II. ANALYSIS

Generally, the State of Oregon can tax the income of its residents. One relevant exception applicable to the facts of this case is ORS 316.777(1),[1] which provides that:

---

[1] All references to the Oregon Revised Statutes (ORS) are to year 1999 with no subsequent change to the statute applicable to tax year 2002.

"Any income derived from sources within the boundaries of federally recognized Indian country in Oregon by any enrolled member of a federally recognized American Indian tribe residing in federally recognized Indian country in Oregon at the time the income is earned is exempt from tax under this chapter."

There is no dispute that Foreman, who is an "enrolled member of a federally recognized American Indian tribe," the Klamath Indian Tribe, derived income "from sources within the boundaries of federally recognized Indian country in Oregon." *Id.* The parties' sole dispute is whether Foreman resided "in federally recognized Indian country in Oregon at the time" he earned the income. *Id.*

**2.** The starting point in the court's analysis is the definition of "federally recognized Indian country in Oregon." *Id.* This court has previously concluded applicable definitions are found in 18 USC section 1151 (1994)[2] and Oregon Administrative Rule (OAR) 150-316.777(2).[3] *See Spang v. Dept. of Rev.*, 16 OTR 166, 168-69 (1999). In *Spang*, the court summarized the definition of Indian country found in the federal statute into three categories: "(1) reservation land; (2) dependent Indian communities; and (3) Indian allotments." *Id.* at 168. OAR 150-316.777(2) generally defines Indian country as follows: "any federally recognized Indian reservation or other land that has been set aside for the residence of tribal Indians under federal protection." Plaintiffs allege that they live in federally recognized Indian country in Oregon because they reside on reservation land and their Property is an Indian allotment.

The court must determine if Plaintiffs' Property is located within Indian country as defined in 18 USC section 1151. This court has previously stated that if the statute at

---

[2] The term "Indian country" is defined in 18 USC section 1151 (1994) as:

"(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments * * *."

[3] All references to the OAR are to year 2001 with no subsequent change to the OAR applicable to tax year 2002.

issue is a federal statute, the court's "interpretation must be guided by the United States Supreme Court's principles of statutory construction." *Butler v. Dept. of Rev.*, 14 OTR 195, 199 (1997) (citations omitted). The court summarized the process, stating that "the court's function is to enforce the clear language of a statute according to its terms," and, "[i]n determining the meaning of the statute, the court considers the text and context of the statute." *Id.* (citations omitted). The court cautioned that in discerning "the plain meaning of the whole statute," the court should not focus on "isolated sentences." *Id.* (citation omitted).

Plaintiffs remind the court that it is a well grounded canon of construction when interpreting matters of Federal Indian Law that " 'statutes passed for the benefit of dependent Indian Tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' " *Bryan v. Itasca County*, 426 US 373, 392, 96 S Ct 2102, 48 L Ed 2d 710 (1976) (alteration in original) (quoting *Alaska Pacific Fisheries v. United States*, 248 US 78, 89, 39 S Ct 40, 63 L Ed 138 (1918)). Offering instruction similar to that of this court and Plaintiffs, the United States Supreme Court directs that when resolving "legal ambiguities" involving the Klamath Indian Tribe, the law is construed "to the benefit of the Indians;" however, the court "cannot ignore plain language" and the statutory language should be viewed "in historical context and given a fair appraisal." *Oregon Fish & Wildlife Dept. v. Klamath Tribe*, 473 US 753, 774, 105 S Ct 3420, 87 L Ed 2d 542 (1985) (quoting *DeCoteau v. Dist. County Court*, 420 US 425, 447, 95 S Ct 1082, 43 L Ed 2d 300 (1975) and *Washington v. Wash. Fishing Vessel Assn.*, 443 US 658, 99 S Ct 3055, 61 L Ed 2d 823 (1979)) (internal quotation marks omitted).

## A. *History of the Klamath Indian Tribe*

In evaluating whether Plaintiffs reside in Indian country, the history of the Klamath Indian Tribe is relevant. In brief, "[i]n the early 19th century, the Klamath and Modoc Tribes and the Yahooskin Band of Snake Indians claimed aboriginal title to approximately 22 million acres of land extending east from the Cascade Mountains in southern

Oregon. In 1864 these Tribes (now collectively known as the Klamath Indian Tribe) entered into a Treaty with the United States, ceding 'all their right, title and claim to all the country claimed by them' and providing that a described tract of approximately 1.9 million acres 'within the country ceded' would be set apart for them, to be 'held and regarded as an Indian reservation.' " *Oregon Fish & Wildlife Dept.*, 473 US at 755 (quoting Treaty with the Klamath, Oct 14, 1864, 16 Stat 707, 708). "Subsequently a dispute arose as to the reservation's boundaries, and after lengthy negotiations concerning the value of land that had been erroneously excluded from the reservation, the Tribe and the Government executed a 1901 Cession Agreement (ratified by Congress) under which the Tribe, upon receiving payment [$537,007.20] from the Government, ceded [621,824 acres] of the reservation land to the [United States]." *Id.* at 753, 760. "The reservation was thereby diminished to approximately two-thirds of its original size as described in the 1864 treaty." *Id.* at 760. "Between 1901 and 1906, virtually all of the ceded land was closed to settlement entry and placed in national forests or parks * * * a status much of the land retains to this day." *Id.* at 761 (citation omitted).

■       "In 1954, Congress terminated federal supervision over the Klamath Tribe and its property including the Klamath Reservation." *Id.* (citing Klamath Termination Act, Pub L 587, ch 732, § 1, 68 Stat 718-23 (1954) (codified as amended at 25 USC §§ 564-564x (Supp II 1952)). "The Termination Act required members of the Tribe to elect either to withdraw from the Tribe and receive the monetary value of their interest in tribal property, or to remain in the Tribe and participate in a non-governmental tribal management plan." *Id.* at 761 (citing section 564d(a)(2)). The purpose of the Termination Act was "to end federal supervision, * * * remove from the Indians their special status as Indians, and * * * make state laws applicable to them in the same manner as applicable to other citizens." *Klamath & Modoc Tribes v. Maison*, 338 F2d 620, 622 (9th Cir 1964) (citation omitted). "The Termination Act also authorized the sale of that portion of the reservation necessary to provide funds for the compensation of withdrawing members, and the transfer of the unsold

portion to a private trustee." *Oregon Fish & Wildlife Dept.*, 473 US at 761-62 (citing section 564e(a)). Much of the land commonly referred to as the Klamath Indian Tribe Reservation was transferred with a fee simple title. *See* § 564g(b).

██ ██ The Klamath Indian Tribe's status as a recognized Indian Tribe was federally restored by the Klamath Indian Tribe Restoration Act (Restoration Act) of August 27, 1986. Pub L 99-398 § 2, 100 Stat 849 (1986) (codified as amended at 25 USC § 566 (Supp IV 1982)). The Restoration Act provided that "[n]otwithstanding any other provision of law, the tribe and its members shall be eligible, on and after August 27, 1986, for all Federal services and benefits furnished to federally recognized Indian tribes or their members *without regard to the existence of a reservation for the tribe.*" *Id.* § 566(c) (emphasis added). Further, the Restoration Act stated that "[a]ny member residing in Klamath County shall continue to be eligible to receive any such Federal service *notwithstanding the establishment of a reservation for the tribe in the future.*" *Id.* (emphasis added).

B. *Is Plaintiffs' Property within the limits of the Klamath Indian Tribe Reservation?*

Plaintiffs allege their Property held in fee simple title is Indian country because it is located within the existing Klamath reservation boundary as it existed prior to the enactment of the Termination Act. Plaintiffs acquired the fee simple title to their Property as a consequence of the Termination Act. In order to agree with Plaintiffs that their Property is Indian country, the court would need to conclude that the clear language of the statute "Indian reservation" has the same plain meaning as "reservation boundary."

As Plaintiffs allege, the Klamath Indian Tribe reservation boundary set out in the late 1800s exists today. However, the Klamath Indian Tribe Reservation is substantially reduced in size.[4] The Termination Act "terminated federal supervision over trust and restricted property of the

---

[4] As a consequence of the Termination Act, the Klamath Indian Tribe relinquished over 20 million acres of land. Currently, 390 acres of reservation and land are set aside for the Klamath Indian Tribe. *See 2003-05 Oregon Directory of American Indian Resource,* compiled and edited by Gladine G. Ritter, Commission Assistant, Legislative Commission on Indian Services.

Klamath Indians, disposed of federally owned property, and terminated federal services to the" Klamath Tribe. *Kimball v. Callahan*, 590 F2d 768, 775-76 (9th Cir 1979). *See also The Klamath Tribes v. United States*, No 96-381-HA, 1996 WL 924509 at *2-3 (D Or, Oct 2, 1996) (stating that the "Tribes lost ownership of the reservation land" and that the "former Klamath Reservation is now predominately part of the Winema and Fremont National Forests").

The Restoration Act restored federal recognition of the tribal status of the Klamath Indian Tribe. However, it did not restore the majority of reservation lands of the Klamath Indian Tribe that were previously terminated. To the contrary, the Restoration Act specifically stated that "[n]othing in this subchapter shall alter any property right or obligation * * *." Restoration Act § 566(d). The Restoration Act specifically states that the restoration of federal recognition is not contingent on "the existence of a reservation for the tribe." *Id.* § 566(c). Further, the Restoration Act states that should a reservation be established for the Klamath Indian Tribe in the *future,* the members of the Klamath Indian Tribe residing in Klamath County shall "continue to be eligible to receive" federal services. *Id.*

For the Klamath Indian Tribe, Congress chose to restore the federal services and benefits without restoring or adding to the reservation lands. In contrast, when the Confederated Tribes' status as a recognized Indian tribe was federally restored by the Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians Restoration Act of October 17, 1984, the Secretary of the United States Department of the Interior was directed "to accept specifically identified parcels of land into trust for the benefit of the tribe." *Confederated Tribes of Coos v. Babbitt*, 116 F Supp 2d 155, 159 (DDC 2000) (citing 27 USC § 714e(b)). In passing that Restoration Act, Congress added "new lands which were not previously considered part of the Confederated Tribes' reservation." *Id.* at 160.

Congress set forth a procedure in 25 USC section 465 to follow when acquiring lands for tribal communities which takes into account the interest of others with "stakes in the area's governance and well being." *City of Sherrill v. Oneida Indian Nation*, 544 US 197, 220, 125 S Ct 1478, 1493, 161 L

Ed 2d 386 (2005). The regulations implementing section 465 "authorize the Secretary of the Interior to acquire land in trust for Indians and provides that the land 'shall be exempt from State and local taxation.'" *Id.* at 1493-94 (quoting § 465). Plaintiffs allege that some parcels of land have been placed into trust on behalf of the Klamath Tribes. However, there is no evidence Plaintiffs' Property was one of the parcels placed in trust for the Klamath Indian Tribe.

■ In support of Plaintiffs' position that their land is under the jurisdiction of the United States, Plaintiffs allege that the court's holding in *Klamath Tribes v. United States* shows that the land within the reservation boundaries is still set aside for the continued use of the Klamath Indians and that the Federal Government continues to exercise superintendence over it. In defining federal superintendence, the parties disagree as to whether the federal supervision is required to the exclusion of the state. That question was answered by the Ninth Circuit Court of Appeals in *Kimball v. Callahan*, which concluded that federal and state supervision can coexist with each designated jurisdiction. 493 F2d 564, 568 (9th Cir 1974). Specifically, Public Law 280 (18 USC § 1162 (Supp II 1952)), passed at the same time as the Termination Act and that became effective seven years before the Termination Act, "granted certain states jurisdiction 'over offenses committed by or against Indians in the areas of Indian country' named in the Act." *Kimball,* 493 F2d at 568 (quoting section 1162). In Oregon, the "area" was described as "'[a]ll Indian country within the State except the Warm Springs Reservation.'" *Id.* (quoting section 1162). In a different case involving the Termination Act, the United States Supreme Court held that "Public Law 280 preserved treaty hunting and fishing rights even after termination." *Id.* (citing *Menominee Tribe of Indians v. United States*, 391 US 404, 411, 88 S Ct 1705, 20 L Ed 697 (1968)). The Ninth Circuit Court concluded that "Public Law 280 must therefore be considered *in pari materia* with the Termination Act. The two Acts read together mean to us that although *federal supervision of the tribe was to cease* and all tribal property was to be transferred to new hands, the hunting and fishing rights granted or preserved by the Wolf River Treaty of 1854

survived the Termination Act of 1954." *Id.* (emphasis added) (citing *Menominee Tribe of Indians*, 391 US 404, 411).

Plaintiffs would like this court to conclude that, because the hunting and fishing rights enjoyed by the Klamath Indian Tribe continue within the Klamath Indian Tribe reservation boundary, it follows that federal superintendence of those lands is evidence of an Indian reservation. Unfortunately, the court is unable to reach that conclusion. The United States Supreme Court and the Ninth Circuit Court held that "Indians may enjoy special hunting and fishing rights that are independent of any ownership of land, and that, as demonstrated in 25 USC [section] 564m(b), the 1954 Termination Act for the Klamath Tribe, such rights may survive the termination of an Indian reservation." *Oregon Fish & Wildlife Dept.*, 473 US at 765-76.

In sum, the court concludes that the existing Klamath reservation boundary is not Indian country within the meaning of 18 USC section 1151(a). Plaintiffs' Property is not under the jurisdiction of the United States. Further, Plaintiffs' Property is not located within the limits of the existing Klamath Indian Tribe reservation.

C. *Does Plaintiffs' Property qualify as an Indian Allotment?*

■ Plaintiffs allege that because the Foreman Property has not passed out of Indian ownership, it maintains its character as an Indian allotment, hence Indian country, under 18 USC section 1151(c). In *Spang*, this court recited the United States Supreme Court definition of allotment: "An allotment is a 'parcel[ ] of land created out of a diminished Indian reservation and held in trust * * * for the benefit of individual Indians * * *.'" 16 OTR at 169 n 3 (citing *Alaska v. Native Vill. of Venetie Tribal Gov't.*, 522 US 520, 529, 118 S Ct 948, 140 L Ed 2d 30 (1998) (alteration in original). Further, the court stated that an allotment is "a specific parcel held in trust for the benefit of a particular Indian or group of Indians." *Id.* at 169 n 3. "An Indian allotment may be either a parcel held in trust by the federal government for the benefit of an Indian (a trust allotment) or a parcel owned by an Indian subject to a restriction on alienation in favor of the United States (a restricted allotment)." *Yankton Sioux Tribe v.*

*Gaffey*, 188 F3d 1010, 1022 (8th Cir 1999) (citing *United States v. Stands*, 105 F3d 1565, 1571-72 (8th Cir 1997)). "Under [section] 1151(c) both types of allotments are Indian country regardless of whether they are on or off an Indian reservation." *Id.* (citing *Native Village of Venetie*, 522 US at 529).

■■■■ The court acknowledges that Plaintiffs' Property was held in trust until December 11, 1958. At that time, the Property owner was granted fee title. Plaintiffs allege that because the Property has always been in Klamath tribal or Klamath Indian ownership, the Indian title to the Property has never been extinguished and it remains Indian country. The court does not dispute the Property's chain of title. However, an allotment does not merely hinge on a chain of title. It is based on how the land is held, specifically "in trust for the benefit of a particular Indian or group of Indians." *Spang,* 16 OTR at 169 n 3. In this case, Plaintiffs own their land in fee title. Plaintiffs' Property is not being "held *in trust* for the benefit" of anyone. *Id.* (emphasis added). Further, Plaintiffs' Property is owned in fee simple, with no "restrictions on alienation in favor of the United States." *Yankton Sioux Tribe*, 188 F3d at 1022 (holding that "lands that are owned in fee without such restrictions on alienation do not qualify as Indian country under [section] 1151(c); but they may be classified as Indian country under [section] 1151(a) if they are within the boundaries of an Indian reservation"). Plaintiffs' Property is not an allotment under the statutory requirements of 25 USC section 1151(c).

## III.  CONCLUSION

After carefully reviewing the stipulated facts and analyzing the statutes in historical context with case law, the court finds that Plaintiffs do not live in Indian country because their Property is not within the Klamath Indian Tribe Reservation and is not a trust or restricted allotment. Now, therefore,

IT IS THE DECISION OF THIS COURT that the income earned by Plaintiff, Allen Foreman, is not exempt from state taxation for tax years 2001 and 2002.