BROWN, Circuit Judge,
dissenting in part:
I join Parts I and II of the court’s opinion, but I cannot agree § 5 of the IRA is constitutional. Consequently, I dissent from Part III.
*34 I
Like other courts that have rejected nondelegation challenges to § 5, Carcieri v. Kempthome, 497 F.3d 15, 41-43 (1st Cir.2007) (en banc); South Dakota v. U.S. Dep’t of the Interior, 423 F.3d 790, 799 (8th Cir.2005); United States v. Roberts, 185 F.3d 1125, 1137 (10th Cir.1999), the majority nominally performs a nondelegation analysis but actually strips the doctrine of any meaning. It conjures standards and limits from thin air to construct a supposed intelligible principle for the § 5 delegation. Although I agree the nondele-gation principle is extremely accommodating, the majority’s 'willingness to imagine bounds on delegated authority goes so far as to render the principle nugatory. Analyzing the statute using ordinary tools of statutory construction, as the Supreme Court has always done in nondelegation cases, I am forced to conclude § 5 is unconstitutional.
The nondelegation doctrine prohibits Congress from making unbridled delegations of authority. The rule is not only a fundamental aspect of the separation of powers; it is an essential feature of democratic government. “[T]he delegation doctrine! ] has developed to prevent Congress from forsaking its duties.” Loving v. United States, 517 U.S. 748, 758, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). [T]he constitutional question is whether the statute has delegated legislative power to the agency ... [The Constitution’s] text permits no delegation of those powers.” Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); see also Mistretta v. United States, 488 U.S. 361, 371, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (“The nondelegation doctrine is rooted in the principle of separation of powers....”); J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928) (“[I]t is a breach of the National fundamental law if Congress gives up its legislative power.... ”). The nondelegation principle is integral to any notion of democratic accountability.
Thus, when Congress directs an agency to exercise its judgment, it must guide that judgment in some way. I agree with the majority that the nondelegation principle is not an onerous requirement. Nevertheless, Congress must at least “clearly delineate[ ] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.” Mistretta, 488 U.S. at 372-73, 109 S.Ct. 647; Am. Power & Light Co. v. SEC, 329 U.S. 90, 105, 67 S.Ct. 133, 91 L.Ed. 103 (1946). The central question is whether there are “limits on [an agency’s] discretion.” Whitman, 531 U.S. at 473, 121 S.Ct. 903.
Like the majority, I take Whitman to have identified two ways in which Congress may provide the necessary bounds on a delegation: standards to guide an agency’s judgment or, in their absence, stringent limits on the scope of the delegated authority. Standards to guide an agency are the ordinary way to limit its discretion. In the leading ease, A.L.A Schechter Poultry Corp. v. United States, the Supreme Court invalidated § 3 of the National Industrial Recovery Act, which allowed trade associations to develop codes of fair competition the President could adopt as law, with conditions as he thought “necessary.” 295 U.S. 495, 522-23, 542, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). This statute was flawed because it “conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring ‘fair competition.’ ” Whitman, 531 U.S. at 474, 121 S.Ct. 903. Alternatively, “Congress need not provide any direction” if the “scope of the power congressionally conferred” is sufficiently small. Id. at 475, *35 121 S.Ct. 903. Either type of limit suffices on its own, but at least one must be present.
Thus, the “intelligible principle” required of a constitutional delegation is fairly minimal: a statute will fail only if it gives an agency too broad an authority with no standards to guide the agency’s decisions. Section 5 is a rare example of a standardless delegation, allowing the Secretary of the Interior to take land in trust for whichever Indians he chooses, for whatever reasons. This power is far too broad in scope for Congress to have delegated without any standards.
II
A
First, § 5 lacks standards to guide the Secretary in the exercise of his authority. Such standards would not have to provide a “determinate criterion” to govern agency decisions, as long as they provide “substantial guidance.” Whitman, 531 U.S. at 475, 121 S.Ct. 903. Standards need only provide some criteria, some guidelines, or some direction, so that when an agency exercises its judgment, the agency and the courts have some “intelligible principle” by which to gauge whether the agency’s decision will further the purpose of the delegation. For example, to guide the Sentencing Commission, “Congress directed it to consider seven factors,” listed in the statute. Mistretta, 488 U.S. at 375, 109 S.Ct. 647. In Whitman, the Clean Air Act required the EPA “to set air quality standards at the level that is ‘requisite’ ... to protect the public health with an adequate margin of safety.” 531 U.S. at 475-76, 121 S.Ct. 903.
“Whether [a] statute delegates legislative power is a question for the courts,” Whitman, 531 U.S. at 473, 121 S.Ct. 903, and the purpose of an intelligible principle is to make sure it is not “impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed.” Yakus v. United States, 321 U.S. 414, 426, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Congress must provide legal standards because “[pjrivate rights are protected by access to the courts to test the application of the policy in the light of’ the standards. Am. Power & Light Co., 329 U.S. at 105, 67 S.Ct. 133. Thus, since Congress must lay down these standards by “legislative act,” Mistretta, 488 U.S. at 372, 109 S.Ct. 647, we should seek standards for a delegation using the ordinary tools of statutory construction.
The kinds of tools the majority uses are occasionally appropriate aids for ascertaining the meaning of ambiguous statutory text. On the other hand, when a standard is not ambiguous, but simply absent, we may not supply one by ourselves. See Conn. Nat’l Bank v. Germain, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); Gen. Elec. Co. v. EPA, 360 F.3d 188, 191 (D.C.Cir.2004). The majority not only supplies an absent standard, it actually invents the standard, imbuing § 5 with a spirit of “economic development” that somehow emanates from the context of the IRA.
In many nondelegation cases, Congress at least hints at a standard by directing an agency to exercise its authority “in the public interest” — words indicating some congressionally imposed limit, even if the vagueness of the phrase makes a court work to interpret it. Here, by contrast, the Secretary “is authorized” to acquire land for Indians “in his discretion.” Rather than an ambiguous standard that requires interpretation, § 5 provides an obvious, unambiguous direction that the Secretary is to have complete discretion.
The majority proceeds, in the teeth of this clear text, to find, in the emanation *36 from a variety of sources, the supposed true intelligible principle behind § 5: promoting Indian economic development so Indians can achieve “self-support,” and recouping losses of land. But this standard arises from the majority’s imagination, not from the sources.
First, the court cites the preamble to the IRA: “to conserve and develop Indian land and resources.” Maj. Op. at 31. A policy of developing land is no more informative than a purpose of providing land, as a standard to help the Secretary decide whether to acquire a particular parcel. Nor do the preamble’s policies of “extending the right to form business[es] ... establishing a credit system,” and the rest, give any better direction.
Second, the majority examines the structure of the IRA. Maj. Op. at 31. Among its many provisions, the IRA makes trust status permanent, §§ 2 and 4, and provides for the recovery of Indian lands that had been opened for sale, § 3. Ironically, the restoration of lands under § 3 is not automatic, but rests in the Secretary’s hands. Unlike § 5 acquisitions, the Secretary is to restore surplus lands “if he shall find it to be in the public interest.” Ordinarily, a comparison of § 3 and § 5 would lead us, first, to conclude § 5 gives the Secretary authority to acquire new land, and, second, to construe § 5 to grant Secretary broader discretion when he acquires new land than when he restores surplus land. Instead the majority reads into § 5 an “emphasis” on recouping losses of land, an emphasis the text does not support. The majority also sees an emphasis on preventing losses of existing land, even though § 8, which declares that the IRA shall not cover “Indian holdings of allotments or homesteads upon the public domain outside” of reservations, actually limits the effect of the IRA on existing Indian land. Nor is it plausible to find a principle of “self-support” in a statute that actually installs a paternalistic scheme of government support. See § 4 (barring Indians from selling or transferring their trust land); § 12 (directing the Secretary to establish preferences for hiring Indians at the Indian Office); § 11 (appropriating money to send Indians to “vocational and trade schools” of which only a limited amount may be spent for education in “high schools and colleges”); § 6 (establishing the Secretary’s authority over how Indians should manage their forests and how many cows they may graze on their pastures).
The majority also cites the special trust relationship the United States bears towards Indians, waving the idea of this relationship as a talisman to bless the statute rather than actually using it to interpret the text. Nor could this trust relationship be useful to interpret § 5, because in fact the government has no freestanding duty, outside of specific statutes, treaties, or executive orders, to ensure its actions do not harm Indian interests. N. Slope Borough v. Andrus, 642 F.2d 589, 611 (D.C.Cir.1980) (Secretary’s trust obligations, if any, were coterminous with the ESA’s requirements); see also United States v. Wilson, 881 F.2d 596, 600 (9th Cir.1989) (“Absent ... a fiduciary duty based on an authorizing document such as a statute or a regulation ... there can be no trust relationship between [a tribe] and the BIA.”).’ The only trust responsibility created by § 5 exists after the government acquires a parcel of land and therefore cannot guide the Secretary’s decision whether to acquire the parcel. The majority adverts to the “unique history” of Indians in the United States, but this history gives rise only to “a moral obligation, without justiciable standards for its enforcement.” Reid P. Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stan. L.Rev. 1213, *37 1227 (1975). At best, courts distinguish statutes relating to Indians by applying the Indian canon of construction, County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 269, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), but “[t]he canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist.” South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986).
To summarize, the statutory language lacks any discernible boundaries. To rely on the purpose of “providing land for Indians” does nothing to cabin the Secretary’s discretion over providing land for Indians because it is tautological. To say the purpose is to provide land for Indians in a broad effort to promote economic development (with a special emphasis on preventing land loss) is tautology on steroids. Making a different selection from the same smorgasbord, I might posit quite different principles — to provide land for landless Indians; to acquire trust lands to be used for farming; to supplement grazing and forestry lands; to provide lands in close proximity to existing reservations; to consolidate checkerboarded reservations. All of these goals would be reasonable, but none can be derived from the text of the IRA. The very fact that so many standards can be proposed merely highlights the fact that the statute itself fails to describe how the power conveyed is to be exercised. Thus, the Secretary’s assertion of unguided power is not subject to any judicial check; nor, conversely, can he be required to act whenever he voluntarily refrains from using his discretionary power.
Even if this mood of economic self-sufficiency can be said to permeate § 5, it has never constituted a standard to guide the Secretary’s decisions. Courts, like the BIA, have consistently interpreted the statute to mean what it says: the Secretary has unfettered discretion over which land to take in trust. See, e.g., State of Fla., Dep’t of Bus. Regulation v. U.S. Dep’t of the Interior, 768 F.2d 1248 (11th Cir.1985) (Secretary may waive BIA regulations to acquire land for a tribal museum, and the court may not review his decision because it is committed to agency discretion). Again and again, courts have rejected challenges to acquisitions as beyond the Secretary’s power, concluding that the “deliberately broad and flexible grant of power” in § 5, Stevens v. Comm’r of Internal Revenue, 452 F.2d 741, 748 (9th Cir.1971), encompasses any possible acquisition. E.g., Chase v. McMasters, 573 F.2d 1011, 1015-16 (8th Cir.1978) (“Congress did not limit the Secretary’s discretion to select land for acquisition”; therefore, it was valid to accept land an Indian already owned and was giving to the United States in trust solely for the purpose of avoiding property taxes). The BIA has also regarded the Secretary’s discretion as absolute, and its review board may only verify whether BIA considered the factors laid out in its own regulations. Eades, 17 I.B.I.A. 198, 200 (1989). Most recently, BIA has begun to deny trust applications for building casinos if it finds the casinos to lie beyond a “commutable” distance from tribes’ existing reservations. See Memorandum from Carl Artman, Ass’t Sec’y of the Interior, on Taking Off-Reservation Land into Trust for Gaming Purposes 1, 3 (Jan. 3, 2008) (“The decision whether to take land into trust ... is discretionary with the Secretary.”).[1]
*38 In light of this history, it is a bit late for the court to claim there is in fact a standard, however loose, to which the Secretary must conform in his exercise of § 5 authority. Nor, given the weight of precedent, would I expect any court to apply the majority’s “economic development with special emphasis” standard in reviewing an acquisition decision.
My point here is not to quibble with the majority’s conclusion that the purpose of § 5 is to enable self-support rather than dependency or to prevent losses rather than acquire new land. Rather, the court should not be playing this game at all. Indeed, the court’s approach differs radically from the Supreme Court’s analytical process in nondelegation challenges. For example, in the Intermountain Rate Cases, the Court, recognizing that “we must be governed by the statute and its plain meaning,” interpreted a challenged section to incorporate a prohibition on “undue preference and discrimination” from the text of a neighboring section. 234 U.S. 476, 485-86, 488, 34 S.Ct. 986, 58 L.Ed. 1408 (1914). In American Power & Light Co., the Court relied on a statute’s specific standards for new security issues that constituted “a veritable code of rules” to inform the SEC’s discretion to ban “unduly or unnecessarily complicate[d]” corporate structures. 329 U.S. at 105, 67 S.Ct. 133. I could continue with examples, but they all illustrate the same point: even in a nondelegation challenge, a court must find meaning for an ambiguous phrase in some relevant text. Here, by contrast, the majority perceives a mood of economic development, which Congress did not articulate, and the majority justifies this mood by its own assessment of Congress’s good intentions.
In short, this court, like the First, Eighth, and Tenth Circuits before it, has constructed an intelligible principle for § 5 that consists simply of knowing why Congress enacted the provision. I do not deny that Congress wanted to alleviate the problems faced by Native Americans. Nevertheless, this alleged intelligible principle is relevant only for nondelegation challenges. The fact that the Supreme Court has also acknowledged the motivation for the IRA, Maj. Op. at 31-32, does not make that motivation any more meaningful as a standard to guide the Secretary’s decisions on trust acquisitions.[2] If it were meaningful, it would be contrary to the plain text of § 5, which gives the Secretary unfettered discretion over such decisions.
B
Given the absence of standards to govern the Secretary’s exercise of his § 5 authority, I conclude the authority is too broad to be valid. Unquestionably, a stan-dardless delegation is valid if it is small; “the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.” Whitman, 531 U.S. at 475, 121 S.Ct. 903. While the majority recognizes that scope matters, it fails to acknowledge that under established nondelegation doctrine, a stan-dardless delegation must be quite narrow. Whitman provided the canonical example of a sufficiently small delegation: EPA can “define ‘country elevators,’ which are to be exempt from new-stationary-source regula *39 tions governing grain elevators.” Id.) see 42 U.S.C. § 7411© (“Any regulations promulgated by the Administrator under this section applicable to grain elevators shall not apply to country elevators (as defined by the Administrator) which have a storage capacity of less than two million five hundred thousand bushels.”).
By contrast, the § 5 power is quite broad. The majority blandly characterizes it as the power to grant status as Indian country, but the majority ignores the far-reaching consequences of that status.[3] By taking land in trust for Indians, the Secretary removes it from the jurisdiction of the State in which it sits and places it under the authority of a tribe. Alaska v. Native Vill. of Venetie Tribal Gov’t, 522 U.S. 520, 529-31, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998) (noting federal land held in trust for Indians is Indian country (citing United States v. McGowan, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938))). Thus, the trust acquisition authority is a power to determine who writes the law, and thus indirectly what the law will be, for particular plots of land.
The consequences of the Indian country designation are profound. Most obviously, Indian country and its beneficial owners are “exempt from State and local taxation.” 25 U.S.C. § 465 para. 4. Indeed, tribal residents of Indian country are even exempt from motor vehicle and state income taxes. Okla. Tax Comm’n v. Sac & Fox Nation, 508 U.S. 114, 127-28, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993); McClanahan v. Ariz. State Tax Comm’n, 411 U.S. 164, 165, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). More generally, Indian country is subject to federal and tribal jurisdiction in both civil and criminal matters. Native Vill. of Venetie, 522 U.S. at 527 & n. 1, 118 S.Ct. 948 (civil); DeCoteau v. Dist. County Court for the Tenth Judicial Dist., 420 U.S. 425, 428 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (civil); see United States v. John, 437 U.S. 634, 649, 654, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978) (reversing state conviction for a crime committed on trust land). A state “presumptively lacks jurisdiction to enforce” its regulations in Indian country. Narragansett Indian Tribe v. Narragansett Elec. Co., 89 F.3d 908, 915 (1st Cir.1996). A tribal sovereign ousts a state, unless Congress expressly provides otherwise. California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).[4] These consequences result not from other statutes, as the majority claims, Maj. Op. at 32-33, but from the “attributes of sovereignty” that “Indian tribes retain.” Id. at 207, 107 S.Ct. 1083; see also Okla. Tax Comm’n, 508 U.S. at 128, 113 S.Ct. 1985, Surely we need not avert our gaze from the constitutional backdrop against which Congress legislates.
*40 Thus, § 5 allows the Secretary, by taking land in trust for Indians, to oust state jurisdiction in favor of government by the beneficiaries he chooses. Although there are certain limits on the scope of this power, such as the restriction that land may only be held “for Indians,” they are not nearly narrow enough to validate a standardless delegation. By comparison to the EPA’s authority to define country elevators, the § 5 power is astoundingly broad. While the EPA was allowed to exempt certain pollution sources, circumscribed by size, from pollution regulations the EPA itself had imposed under a specific provision, 42 U.S.C. § 7411, here the Secretary can completely remove areas of land from the jurisdiction of state and local governments. Athough this power may not need the “substantial guidance” the Supreme Court thought necessary for the EPA’s broad authority to set air-quality standards, Whitman, 531 U.S. at 476, 121 S.Ct. 903, the power it confers is far too broad to survive without any guidance at all.
C
Section 5 gives the Secretary unguided authority to transfer areas of land from the jurisdiction of state and local government to that of various bands of Indians. None of the foregoing implies BIA has exercised its authority wantonly. But the question is not what it has done, but what it has authority to do. The authority was Congress’s to give, and the boundaries were for Congress to provide as well. Since it has failed to do so, I am forced to conclude § 5 of -the IRA is an unconstitutional delegation.

. BIA denies these applications because for far-away applications, the benefit to Indians does not outweigh the “concerns of state and local governments.” Id. at 5 (citing 25 C.F.R. § 151.11(b)). If the majority is right about the principle guiding these decisions, it can *38 not be proper for BIA to deny an acquisition because of the harm to local government caused by "the removal of the land from the tax rolls,” id.

. Amusingly, Mescalero Apache Tribe v. Jones, in perhaps ill-considered dicta, recited the same legislative history as the majority on its way to limiting the tax immunities enjoyed by Indians. 411 U.S. 145, 152-59, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

. The majority also regards the power to hold land in trust as having aspects of Executive authority, apparently akin to the foreign relations powers that mitigated a delegation in Zemel v. Rusk, 381 U.S. 1, 17-18, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Maj. Op. at 32-33. Regardless of the Executive's role in concluding treaties with Indians, “the Constitution places the authority to dispose of public lands exclusively in Congress,” and that includes the power to hold lands in trust. Sioux Tribe of Indians v. United States, 316 U.S. 317, 326, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942); see also U.S. Const, art. IV, § 3 cl. 2 (Property Clause).

. The Gun Lake Band casino project nicely illustrates how substantially a change to Indian country status can affect both Indians and non-Indians in the vicinity of trust land. Local governments stand to lose $85,000 per year in direct property taxes, while the extra traffic and other activity connected to the casino will force local police to hire additional staff at a cost of over $400,000 per year.