# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DUSTIN LEE MACLEOD,

        Defendant-Appellant.

UNPUBLISHED
July 14, 2016

No. 326950
Cheboygan Circuit Court
LC No. 14-4961-FC

---

Before: OWENS, P.J., and BORELLO and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions for manufacture with intent to deliver between 5 and 45 grams of marijuana, MCL 333.7401(2)(d)(*ii*), possession of a firearm by a felon, MCL 750.224f, possession with intent to deliver marijuana, MCL 333.7401(2)(d)(*iii*), harboring a felon, MCL 750.199(3), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to concurrent prison terms of three to 25 years for manufacture with intent to deliver between 5 and 45 grams of marijuana, and three to 15 years each for possession of a firearm by a felon, possession with intent to deliver marijuana, and harboring a felon. The court also sentenced defendant to a prison term of two years for felony firearm, to be served consecutive to all other sentences. We affirm.

## STATEMENT OF FACTS

This case arises from the investigation of defendant for selling marijuana to people for whom he is not a registered caregiver under the Michigan Medical Marihuana Act, MCL 333.2641, *et seq.* The investigation included three controlled buys made using confidential informants Shawn Spohn and his girlfriend, a forward looking infrared radar (FLIR) scan of defendant's residence and of his grow house, and a comparative analysis of the energy bills of buildings similar in size and location to defendant's grow house. Using results obtained from the investigation, Detective Jess Halleck secured search warrants for defendant's residence and grow house on October 14, 2014, and members of the Huron Undercover Narcotics Team (HUNT) and of Straits Area Narcotic Enforcement (SANE) conducted the searches on the same day. Immediately prior to the search of his residence, defendant was arrested at a remote location. Defendant waived his *Miranda* rights, *Miranda v Arizona*, 384 US 436, 86 S Ct 1602, L Ed 2d 694 (1966), and participated in a police interview with Detective Jason Varoni. Among other

things, defendant admitted that he had one to two pounds of newly harvested marijuana at his house, and approximately 40 full-grown plants and an unknown number of clones in a nearby grow house. Defendant identified himself as a medical marijuana grower and caregiver for three patients plus himself, but admitted that he sold "the medicine" to whomever said they needed it.

When officers knocked and announced themselves prior to searching defendant's residence, Megan MacLeod, defendant's sister, ran out the back door, toward the woods, and into the Black River, all the while with one officer yelling at her to stop, and another officer in pursuit. The pursing officer caught her in the middle of the river and turned her over to the proper authorities. Officer Dean Tebo testified that Megan MacLeod was an absconder from the Cheboygan County Jail.

SANE's search of defendant's residence turned up marijuana leaf in bags in the master bedroom and the kitchen freezer, and 23 canisters and 14 plastic baggies with different varieties of marijuana seeds. The team also found a black digital scale, a marijuana drying rack and several firearms.

Detective Halleck testified to the search of the grow house, describing the building as square, brick, and with surveillance cameras at each corner and black material covering the windows to keep the light out. Inside, officers found a garbage can containing marijuana "shake," one grow room with six plants from four to six feet tall, another grow room with four plants from three to four feet tall, a third room with 20 plants from three to four feet tall, and a room with 92 clones. Detective Halleck testified that all or most of the clones had a root system. They also found high-powered grow lights and bulbs in each room. In addition, the grow house had a ventilation system to keep the rooms cool, and a carbon dioxide tank to pump in extra carbon dioxide to help the plants grow. Including clones, officers seized 122 plants. Random samples of 21 plants were sent to the Grayling State Police Crime Laboratory for analysis. They were examined by forensic scientist Karen Brooks, who testified that each tested positive as marijuana.

ANALYSIS

A. JURISDICTIONAL CHALLENGE

Defendant first contends that the trial court erred by denying his motion to dismiss for lack of jurisdiction. We disagree. We review de novo questions regarding the exercise of territorial jurisdiction by a state court in a criminal prosecution. *People v Collins*, 298 Mich App 166, 172; 826 NW2d 175 (2012).

Defendant argued below that the state court did not have jurisdiction in this matter because he is a registered member of the Sault Ste. Marie Chippewa Tribe, and the charged crimes were committed in Indian Country. Defendant relied for support on a map showing the Indian territories ceded to the United States by the Chippewa and Ottawa Tribes in the 1836 Treaty of Washington (hereinafter, the "Treaty of 1836"), 7 Stat 491 (1836), and indicating that Cheboygan County is within the ceded territory. What defendant fails to appreciate, however, is that, once the subject territory was ceded to the United States in the 1836 Treaty, it ceased to be "Indian Country." The federal government defines "Indian Country" as

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. [18 US 1151.]

Defendant presented no evidence establishing that the charged crimes occurred on an Indian reservation, a dependent Indian community,[1] or an Indian allotment.[2] Therefore, the charged crimes did not occur in "Indian Country."

On appeal, defendant contends that the charged crimes occurred in the context of the 2007 Inland Consent Decree. *United States v State of Michigan*, 2:73-cv-26 [2007 Inland Consent Decree] (WD Mich, Nov. 2, 2007). The 2007 Inland Consent Decree, parties to which included the State of Michigan and the Sault Ste. Marie Chippewa Tribe, resolves "conclusively" the extent of the rights of various Tribes to hunt, fish, trap, and gather on the ceded territory, rights reserved by the Tribes in the Thirteenth Article of the Treaty of 1836.

Relevant to the instant appeal, § 6.2(a) of the 2007 Inland Consent Decree (hereinafter the "Decree") provides that tribal members "may Hunt, Fish, Trap, and Gather natural resources, without limitation as to the species (including non-native and artificially propagated species) targeted for harvest, the season or method of harvest, or the use of the resource harvested…." Also relevant is § 6.2(b), which permits each of the Tribes to regulate and to enforce regulation of these treaty-right activities with regard to their members. According to § 24.1, where a Tribe enacts regulations consistent with the Decree and has a forum with the necessary subject-matter jurisdiction, prosecutions of alleged violations of fish and game laws and of regulations by tribal members in the territory ceded in the Treaty of 1836 are to be heard in a tribal forum. Accordingly, § 24.2 precludes the State "from initiating prosecutions of the Tribes' members in State courts for violations of State law or regulations pertaining to Hunting, Trapping, otherwise taking any species of wildlife, Fishing, or Gathering, when such acts are within the scope of this Decree or subject to Tribal regulations that are consistent herewith."

Defendant asserts on appeal that the Decree gives him the right to gather, grow, and medicinally share cannabis, especially among tribal members in Section 5 areas,[3] without

---

[1] "Dependent Indian community" refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence. *Alaska v Native Village of Venetie Tribal Gov't*, 522 US 520, 527; 118 S Ct 948, 953; 140 L Ed 2d 30 (1998).

[2] An Indian allotment refers to "the selection of specific land awarded to an individual allottee from a common holding." *Black's Law Dictionary* (10th ed).

interference from the State. Further, he asserts that the state court is without jurisdiction to interpret the Decree, and that his mere assertion that his activities fall under the Decree is sufficient to remove this case to tribal or federal court. Defendant does not support this latter position with authority. In § 1.3 of the Decree, the federal court retained jurisdiction over the parties and the subject matter "of the action to enforce [the] Decree and to resolve disputes arising under [the] Decree"; however, nothing in this provision prohibits a state court from initially determining whether a particular dispute falls under the Decree and, thus, outside its own jurisdiction.

Consent decrees are construed in the same manner as contracts. See *Bd of Co Rd Comm'rs for the Co of Eaton v Schultz*, 205 Mich App 371, 378; 521 NW2d 847 (1994). In ascertaining the meaning of a contract, appellate courts give "the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). When a term is undefined, consulting a dictionary is appropriate. See *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 515; 773 NW2d 758 (2009).[4]

Section 20.1 of the Decree authorizes tribal members to "[g]ather plant materials and other natural resources on state lands for personal, medicinal, cultural, or traditional craft use…." Section 3.6 of the Decree defines "gather" or "gathering" as to take or acquire, or to attempt to take or acquire, "possession of any wild plant or part thereof or other natural resource." Although the Decree does not define "wild," with regard to plants, it means "growing or produced without human aid or care." *Merriam-Webster's Collegiate Dictionary* (2003). *Vushaj*, 284 Mich at 515.

It is clear from the facts of this case that defendant was not gathering wild plant material as defined by the Decree, but was growing carefully cultivated marijuana plants in an operation located in a building equipped with grow lights, ventilation, carbon dioxide tanks, and security cameras. In fact, defendant distinguished his enterprise from "gathering wild" marijuana when he surmised in his interview with Detective Sergeant Varoni that few people had sought him out in recent days because wild marijuana currently was blossoming and people may have been picking the buds for themselves. Thus, by his own admission, defendant was not "gathering wild" plants within the meaning of the Decree.

Defendant advances two additional arguments against state jurisdiction in a brief submitted under Administrative Order 2004-6, a "standard 4 brief." He contends that the state lacks jurisdiction to prosecute crimes where both the perpetrator and the victim are Indians and that private property owned by tribal members or the spouse of a tribal member constitutes "Indian Country." Both of these arguments fail. Federal law gives federal or tribal criminal law

---

[3] Section 5 of the Decree identifies the limited areas within the ceded territory to which the provisions of the Decree apply. Generally, these are public lands, private lands open to public use, and property owned by a Tribe, a tribal member, or the spouse of a tribal member.

[4] Although *Vushaj* dealt with interpretation of an insurance policy, the same interpretive principles apply to contracts. *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 714; 706 NW2d 426 (2005).

generally exclusive application only to crimes committed in "Indian Country." *Nevada v Hicks*, 533 US 353, 365, 121 S Ct 2304, 150 L Ed 2d 398 (2001). As explained above, defendant's charged crimes did not occur in "Indian Country." Regarding his second argument, defendant provides no authority for his position that private ownership of property by a tribal member or the spouse of a tribal member converts into "Indian Country" property that otherwise is not "Indian Country" as defined by 18 USC 1151.

Michigan "has statutory territorial jurisdiction 'over any crime where any act constituting an element of the crime is committed in Michigan.' " *Collins*, 298 Mich App at 172, quoting MCL 762.2. Because the conduct for which defendant was criminally charged occurred in Michigan, and not in "Indian Country" or under the terms of the Decree, the state court had jurisdiction to hear the case against defendant. Accordingly, the trial court did not err in denying defendant's motion to dismiss for lack of jurisdiction.

## B. CONFRONTATION CLAUSE

Defendant next contends that the trial court violated his Sixth Amendment right of confrontation by failing to grant a mistrial when the prosecution failed to produce certain endorsed witnesses. We disagree. We review a preserved claim of constitutional error de novo. *People v McPherson*, 263 Mich App 124, 131; 687 NW2d 370 (2004). "However, when a trial court commits an error that denies a defendant his constitutional rights under the Confrontation Clause, US Const, Am VI and Am XIV, we need not reverse if the error is harmless beyond a reasonable doubt." *Id*.

The Confrontation Clause guarantees a defendant's right to be confronted with the witnesses against him or her, US Const, Am VI; Const 1963, art 1, § 20, and "prohibits the admission of all out-of-court testimonial statements unless the declarant was unavailable at trial and the defendant had a prior opportunity for cross-examination." *People v Chambers*, 277 Mich App 1, 10; 742 NW2d 610 (2007), citing *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354, 158 L Ed 2d 177 (2004). "A statement by a confidential informant to the authorities generally constitutes a testimonial statement." *Chambers*, 277 Mich App at 10, citing *United States v Cromer*, 389 F3d 662, 675 (CA 6, 2004).

Nevertheless, the Confrontation Clause " 'does not bar the use of out-of-court testimonial statements for something other than establishing the truth of the matter asserted.' " *McPherson*, 263 Mich App at 133, quoting *Crawford*, 541 US at 59 n 9. It is not a violation of the Confrontation Clause to admit out-of-court testimonial statements to show the effect of the statement on the hearer. *Chambers*, 277 Mich App at 11. "Specifically, a statement offered to show why police officers acted as they did is not hearsay." *Id*.

The gravamen of defendant's argument is not that testimonial statements were in fact entered against him at trial in violation of the Confrontation Clause, but that the prosecution failed to produce certain endorsed witnesses; specifically, the CIs, Spohn and his girlfriend.

Defendant cites no legal authority for his proposition that the prosecution's failure to produce endorsed witnesses violates the Confrontation Clause.[5]

Our review of the record shows that the detective who supervised two of the controlled buys testified that Spohn said he could purchase marijuana from defendant, and that defendant had a green pickup truck. Although such statements by a confidential informant to a police officer are testimonial, *Chambers*, 277 Mich App at 10, the record clearly shows that the statements were not offered to establish the truth of the matter stated, but to show why the police acted as they did. *Id*. at 11. Specifically, they explained why officers set up controlled buys targeting defendant and that they used the information about defendant's truck to help locate the grow operation. Statements offered to show why police officers acted as they did are not hearsay. *Id*. Spohn and his girlfriend did not testify against defendant at trial, and Spohn's testimonial statements were offered by the detective to show why police acted as they did. Defendant fails to establish a violation of the Confrontation Clause. Consequently, defendant's claim to have suffered violation of his rights under the Confrontation Clause fails.

## C. RIGHT TO PRESENT A DEFENSE

Defendant next contends that the trial court reversibly erred when it granted the prosecution's motion in limine to prohibit defendant from mentioning his Native American Heritage, thus denying his due-process right to present a defense. Again, we disagree. We review whether defendant suffered a deprivation of his constitutional right to present a defense de novo. *People v Powell*, 303 Mich App 271, 277; 842 NW2d 538 (2013). We review a trial court's pretrial decision on a motion in limine for an abuse of discretion. *People v VanSickle*, 303 Mich App 111, 117; 842 NW2d 289 (2013). "A trial court necessarily abuses its discretion when it makes an error of law." *People v Waterstone*, 296 Mich App 121, 132; 818 NW2d 432 (2012).

A defendant in a criminal case has a constitutional right to present a defense. US Const Ams VI, XVI; Const 1963, art 1, §§ 17, 20, and such right is a fundamental right of due process, *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984). Generally, all relevant evidence is admissible unless constitutionally prohibited or prohibited by Michigan's Rules of Evidence. MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." MRE 401. " '[T]he relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material.' " *People v Powell*, 303 Mich App at 277, quoting *People v Brooks*, 453 Mich 511, 520; 557 NW2d 106

---

[5] Where the prosecution fails to produce endorsed witnesses, or fails to provide reasonable assistance to a defendant to locate and serve process on a witness, an appropriate remedy is for the trial court to instruct the jury that it may infer that the missing witness would have been unfavorable to the prosecution. *People v Perez*, 469 Mich 415, 420; 670 NW2d 655 (2003); MCL 767.40a(5). Here, the trial court gave the missing-witness instruction with respect to Spohn, whom the prosecutor said had moved to Tennessee and could not be located. Defendant did not request the missing-witness instruction with regard to Spohn's girlfriend.

(1996). " '[A] material fact need not be an element of a crime or cause of action or defense but it must, at least, be in issue in the sense that it is within the range of litigated matters in controversy.' " *Powell*, 303 Mich App at 277, quoting *Brooks*, 453 Mich at 518.

Defendant argues that, because the conduct for which he was criminally charged accorded with the jurisdictional rights afforded him under the aforementioned Decree, his Native American heritage was an essential element in his defense. Defendant asserted and proved his Native American heritage in the context of the jurisdictional challenge; however, once the trial court properly exercised jurisdiction over the matter, defendant's Native American heritage could provide him neither immunity nor defense under the MMMA. Therefore, his heritage was neither relevant nor material. *Powell*, 303 Mich App at 277. Consequently, defendant did not suffer a constitutional deprivation of his right to present a defense, and the trial court did not abuse its discretion by granting the prosecution's motion in limine to prohibit defendant's mention of his heritage. *Waterstone*, 296 Mich App at 132.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next advances numerous claims of ineffective assistance of counsel. Defendant preserved this issue with a motion to remand for a *Ginther* hearing filed with this Court. However, because we denied the motion, *People v MacLeod*, unpublished order of the Court of Appeals, entered March 8, 2016 (Docket No. 326950), our review is limited to mistakes apparent on the record. *People v Henry*, 239 Mich App 140, 146; 607 NW2d 767 (1999). Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact, and reviews de novo questions of constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

"Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009) (internal quotation marks and citation omitted). Generally, to establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms; (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Smith v Spisak*, 558 US 139, 150; 130 S Ct 676; L Ed 2d 595 (2010). Counsel is not ineffective for failing "to advocate a meritless position." *People v Mack*, 265 Mich App 122, 130; 695 NW2d 342 (2005) (internal quotation marks and citation omitted).

Defendant first argues that defense counsel was ineffective for filing a procedurally defective interlocutory appeal with this Court and an untimely notice to remove with the federal district court for the Eastern District of Michigan. Defendant contends that, had defense counsel perfected his interlocutory appeal to this Court, he most likely would have prevailed in his challenge to the trial court's rulings on his motion to dismiss and the prosecution's motion in limine. Given our disposition of these two matters above, there is no reasonable likelihood that defendant would have prevailed, even if defense counsel had perfected the interlocutory appeal. The same is true of defendant's notice to remove filed with the federal district court. Even if

defense counsel had filed a timely notice to remove, defense counsel did not cite, nor does the record indicate that he could validly have relied upon, any of the authorized, substantive grounds for removal found in 28 USC 1442, 1442(a), and 1443.[6] Consequently, even if defense counsel did perform deficiently by filing a procedurally defective interlocutory appeal with this Court and an untimely notice to remove, defendant cannot show prejudice therefrom because there is no reasonable likelihood that he would have prevailed in either venue. *Pickens*, 446 Mich at 314.

Defendant next contends that defense counsel performed deficiently by failing to challenge the initial stop of defendant on the ground that the stop was made to detain defendant while a search warrant was executed on his house. Defendant correctly notes that the United States Supreme Court has held that the *Summers* rule permitting law enforcement officers to detain the occupants of premises being searched is limited to occupants found within the immediate vicinity of the premises. *Bailey v US*, __ US __; 133 S Ct 1031; 185 L Ed 2d 19 (2013); *Michigan v Summers*, 452 US 692, 101 S Ct 2587, 69 L Ed 340 (1981). However, any challenge of the initial stop based on the *Summers/Bailey* rule would have been futile because it pertains to detention of an occupant without an initial showing of probable cause that the occupant had committed a crime. *Summers*, 452 US at 693-695. In the instant case, officers had probable cause to detain and arrest defendant for selling marijuana to a confidential informant in three controlled buys. Defense counsel is not ineffective for failing to follow a futile course of action. See *Mack*, 265 Mich App at 130.

Defendant next contends that defense counsel performed deficiently to defendant's prejudice by failing to challenge the search warrants on the ground that they were not supported by probable cause. Both the United States and Michigan Constitutions "guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000), citing US Const, Am IV; Const 1963, art 1, § 11. To comply with this requirement, the police officers must have a search warrant to conduct a search, or their conduct must fall within one of the narrow exceptions to a search warrant. *Id.* at 418. A search warrant must be based on probable cause to be valid. *Id.* at 417. "Probable cause to issue a search warrant exists where there is a 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime will be found in a particular place." *Id.* at 417-418. "A magistrate's determination of probable cause is given great deference by a reviewing court." *People v Russo*, 439 Mich 584, 604; 487 NW2d 698 (1992) (internal quotation marks and citation omitted).

In the instant case, the search warrant affidavit relayed several statements made by defendant during three undisputed controlled buys. The statements were not reported by the CIs,

---

[6] A criminal prosecution may be removed from state to federal court where the defendant is the United States or any of its officers or agents, an officer of a federal court, or an officer of either House of Congress, a member of the armed forces who acted "under color of his office or status," or a defendant who is denied or cannot enforce his civil rights or equal rights in the state court.

but were captured by the audio recorder/transmitter worn by the CI. Defendant commented on the different strains of marijuana he grew, how much he had spent on his marijuana business, what type of marijuana sells well, and the proximity of his grow house to his residence, and he asked one of the CI's "if he could sell a couple of ounces for him to help keep his yield down." The search warrant affidavit also relayed information about defendant's criminal history, and results of a comparative analysis of previously subpoenaed electrical records from similar buildings in the area of defendant's grow house. Considering the totality of the affidavit and mindful of our deference to a magistrate's probable cause determination, *Russo*, 439 Mich at 604, we find that the search warrant affidavit provided a " 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime will be found in a particular place[,]" *Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000). Consequently, the defendant's argument that the search warrant was devoid of probable cause fails, as does his contention that trial counsel performed deficiently by failing to challenge it. *Mack*, 265 Mich App at 130.

Defendant next contends that defense counsel rendered ineffective assistance when he failed to assert defenses available under the MMMA, specifically, an affirmative defense under § 8, MCL 333.26428, and an immunity defense under § 4, MCL 333. 26424.

Defendant was charged with manufacturing with intent to deliver between 5 and 45 grams of marijuana, and possession of 20-200 plants with intent to deliver. In order to prevail on a pretrial § 8 defense, defendant had to provide evidence that his physician recommended the medical use of marijuana to treat serious or debilitating medical conditions subsequent to a full medical assessment that occurred in the context of a bona-fide physician-patient relationship. MCL 333.26428(a)(1). In addition, the defendant had to show that the one to two pounds of marijuana and 122 marijuana plants he possessed was "not more than reasonably necessary" for his treatment. ML 333.26428(a)(2). Further, defendant had to prove that he was engaged in the medical use of marijuana to treat or alleviate his serious or debilitating medical condition. MCL 333.26428(a)(3). If defendant satisfied all of these elements, he could assert a § 8 defense in a motion to dismiss and, following an evidentiary hearing where defendant met the elements set forth above, the relevant charges would have been dismissed. MCL 333.26428(b).

Defendant does not indicate on appeal how he would have met the requirements of § 8. With the possible exception of his mother, nothing suggests that defendant could have provided prima facie evidence establishing that he, his other three registered patients, his regulars, whom he declined to identify, or any of his random buyers satisfied the requirements of § 8(a)(1). Even if he could have satisfied § 8(a)(1), that he had product enough to provide for his regulars while also supplying the unpredictable needs of random buyers renders it unlikely that he could have presented prima facie evidence satisfying § 8(a)(2). In light of defendant's admissions and the amount of marijuana seized, there appears no reasonable probability that the result of the proceedings would have been different had defense counsel moved to dismiss under § 8. *Smith*, 558 US at 150.

Likewise, there is no reasonable probability that defendant would have been able to assert a successful § 4 defense, which required, among other things, that defendant not possess more than 2.5 ounces of marijuana and 12 plants for each qualifying patient. MCL 333.26424(b)(1). Defendant argues that, if defense counsel had challenged inclusion of the "clones" in the total plant count, the count would have been reduced to 30 plants, which fell within the amount he

was allowed to have under § 4. However, even if the clones had been excluded, defendant admittedly had one to two pounds of marijuana in his residence, which exceeded the 10 ounces he was allowed under § 4.

Further, the marijuana plants had to be kept in an "enclosed, locked facility." 333.26424(b)(2). An "enclosed locked facility" means "a closet, room, or other comparable, stationary, and fully enclosed area equipped with secured locks or other functioning security devices that permit access only by a registered primary caregiver or registered qualifying patient." MCL 333.26423(d). Defendant told Detective Varoni that his father had a key to the grow operation, but that his father did not grow, smoke, or even touch marijuana. Clearly, defendant's father was not a proper "registered primary caregiver" or "registered qualifying patient" entitled to have a key to the "enclosed, locked facility" under MCL 333.26423(d). Because defendant possessed in excess of the 10 ounces of usable marijuana allowed him under § 4, and because there is no evidence that his father's access to the grow facility was in accordance with MCL 333.26423(d), immunity under § 4 was not available to defendant. Consequently, defense counsel did not render ineffective assistance for failing to advocate a meritless position. *Mack*, 265 Mich App at 130.

Defendant next contends that defense counsel rendered ineffective assistance by failing to move to dismiss Megan MacLeod's felony arrest warrant on the ground that she was on medical furlough. Defendant fails to support his contention that defense counsel performed deficiently by, as the prosecution puts it in his brief to this Court, "failing to take on a separate client and secure a favorable outcome for her." Further, although Megan MacLeod had been on medical furlough, she had remained at large for 10 months after the date ordered for her return to the Cheboygan County Jail. Thus, defendant's claim is without merit.

Defendant next argues that defense counsel was ineffective for failing to object to the prosecution's introduction into evidence of the audio recordings of the controlled buys on the ground that the recordings constituted 404(b) evidence admitted to show defendant's propensity to make such sales.

MRE 404(b)(1) provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The Supreme Court "unanimously confirmed that the opinions in *People v VanderVliet*, 444 Mich 52, 508 NW2d 114 (1993), amended 445 Mich 1205, 520 NW2d 338 (1994), *People v Crawford*, 458 Mich 376, 582 NW2d 785 (1998), and *People v Sabin (After Remand)*, 463 Mich 43, 614 NW2d 888 (2000), 'continue to form the foundation for a proper analysis of MRE 404(b).' " *People v Mardlin*, 487 Mich 609, 615 n 6; 790 NW2d 607 (2010), quoting *People v*

*Knox*, 469 Mich 502, 510, 674 NW2d 366 (2004). Relevant to the instant appeal, the Court stated:

> Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the MRE 403 balancing test, which permits the court to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice...." MRE 403. Finally, upon request, the trial court may provide a limiting instruction to the jury under MRE 105 to specify that the jury may consider the evidence only for proper, noncharacter purposes. [*Mardlin*, 487 Mich at 615-616 (citations omitted).]

Thus, under *Mardlin*, even if the audio tapes reflected on defendant's character, they were admissible nonetheless because they were relevant to a noncharacter purpose, i.e., motive, intent, plan, and scheme. *Id*. at 615. Apart from insisting that the tapes were propensity evidence, defendant does not elaborate on his assertion that their admission was unfairly prejudicial. The tapes essentially confirmed what defendant admitted in his interview with Detective Varoni. Thus, even if the tapes had been excluded, the jury would receive substantially the same evidence from defendant's police interview and from the evidence found at his home and the grow house. Based on the foregoing, defendant has not shown that, but for defense counsel's failure to object to introduction of the 404(b) evidence, there is a reasonable probability that the result of the proceedings would have been different. *Smith*, 558 US at 150.

Finally, defendant argues that trial counsel rendered ineffective assistance by failing to subpoena Spohn, his girlfriend, and Detective Varoni for trial. Defendant asserts that, if defense counsel "had done his investigation up front and his own subpoenas a different result would have been reasonably probable." Defendant provides no rationale for this assertion, nor any indication of how the result of the proceeding would have differed had defense counsel subpoenaed the CIs and Detective Varoni. Defendant received a missing-witness instruction for Spohn, informing the jury that it could infer that his testimony would have been harmful to the prosecution, and it is not clear what information Detective Varoni could provide, other than substantiation of defendant's admissions. Therefore, given the nature of the evidence and the failure of defendant to explain how their testimony would have affected the outcome of the trial, defendant has failed to establish that he was prejudiced by defense counsel's failure to subpoena these witnesses.

In conclusion, we find that defendant has failed to meet the heavy burden of proving that his defense counsel rendered constitutionally ineffective assistance. *Seals*, 285 Mich App at 17. Given the facts of this case, there is no reasonable probability that, had counsel performed as defendant now claims he should have, the result of the proceedings would have been different. *Smith*, 558 US at 150.

E.  STANDARD 4 ISSUES

Defendant raises several additional issues in his Standard 4 brief.  These issues come to the Court unpreserved and are reviewed for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 762; 597 NW2d 130 (1999).  An error affects substantial rights if it affected the outcome of the proceedings, and it either resulted in the conviction of an innocent person or seriously affected the fairness, integrity or public reputation of the proceedings, *People v Jones*, 468 Mich 345, 355-356; 662 NW2d 376 (2003).

Defendant first contends that he was prosecuted for exercising his role as traditional healer in violation of § 1302(a)(1) of the Indian Civil Rights Act of 1968 (ICRA), 25 USC 1302 the American Indian Religious Freedom Act (AIRFA), 42 USC 1996, and the Religious Freedom Restoration Act (RFRA), 42 USC 2000bb-1 *et seq*.

Section 1302(a)(1) of ICRA is inapplicable because ICRA pertains only to *tribal* courts, and the identified section proscribes them from making or enforcing laws prohibiting the free exercise of religion.  25 USC 1302(a)(1).  The AIRFA is inapplicable because it does not create a cause of action or any judicially enforceable individual rights.  *US v Mitchell*, 502 F 3d 931, 949 (CA 9, 2007).  In order to establish a prima facie case under the RFRA, defendant must first prove that the government has substantially burdened his sincere exercise of religion.  *Abdur-Ra'oof v Dep't of Corrections*, 221 Mich App 585, 587; 562 NW2d 251 (1997).

Defendant's mere assertion that state prosecution burdened his free exercise of religion establishes none of the elements of a prima facie claim under the RFRA.  Further, defendant's observations to Detective Varoni that he was considering getting out of the grow business and into guiding and kayaking because growing was too risky, harder work, and less profitable than people might think do not readily lend themselves to an understanding of defendant's growing and selling activities as an exercise of religion.  Thus, without meaningful argument or record evidence to support his contention, defendant has failed to establish a prima facie claim that the state's prosecution violated his rights under the RFRA.

In reliance on *United States v Levin*, 973 F 2d 463 (CA 5, 1992), defendant next argues that the doctrine of estoppel should bar his prosecution for felony possession of a firearm.  The *Levin* court held generally that, where undisputed extrinsic evidence showed that an agent of the government approved the healthcare marketing scheme in which defendants participated, the government could not prove that defendants had the requisite intent required to convict them of various forms of fraud.  Thus, the agency's "official announcement" was clearly permissive, indicating that the defendants could participate in the approved marketing scheme.

Defendant explains that the trial court dismissed felon-in-possession charges against him in 2002, and argues that this dismissal was an "official announcement" that his Second Amendment right to bear arms had been restored.  In support of his position, defendant notes that, since the dismissal, he has encountered numerous police and court officials who knew he possessed weapons, and none of them arrested or prosecuted him for felon in possession of a firearm.

In order for the principle of estoppel to apply, one must first have an "official announcement," and reliance on that announcement must be reasonable. In this case, there is neither. The trial court's dismissal of charges against him was not an "official announcement" of the type upon which the ruling in *Levin* hinged. If anything, the trial court's dismissal was prohibitive, not permissive; it barred the state from punishing defendant for something the state could not prove he did. Further, relying on the trial court's dismissal as an announcement that one's gun rights have been restored arguably is unreasonable, given that the right of a person convicted of a felony to possess a weapon is governed by MCL 750.224f, which generally requires a lapse of time, the payment of any fines imposed, the service of any prison terms imposed, and the successful completion of all conditions of probation or parole. Until the applicable statutory requirements are met, convicted felons are barred from possessing firearms. MCL 750.224f(1). Defendant does not contend that he fulfilled any of these statutory requirements for regaining the right to possess a firearm. Based on the foregoing, we find no plain error in defendant's prosecution for felon in possession of a firearm.

Defendant next asserts that the state violated his Fifth Amendment right against unlawful searches and seizures when police searched his grow operation before they had "executed a search warrant." To the extent that this claim of error arises from defendant's misunderstanding of what it means to "execute a warrant," defendant's assertion lacks merit. To "execute a search warrant" typically refers to the process of conducting the search authorized by the warrant; it does not mean, as defendant implies, to obtain the search warrant in the first place. The search warrants at issue were obtained on October 14, 2014, and defendant presents no evidence that his home or grow house was searched prior to authorization of the warrants. Therefore, there is no Fifth Amendment violation.

Finally, contrary to defendant's assumption, the prosecution was not required to prove Megan MacLeod's intent to escape jail in order to convict defendant for harboring a felon. For this, the prosecution had to prove only that defendant knowingly or willingly concealed or harbored Megan MacLeod, that the concealment or harboring was done for the purpose of concealment from a peace officer, and that at the time, Megan MacLeod was subject to a felony arrest warrant. We find from our review of the record that the evidence presented on each of these elements was sufficient to support the jury's verdict.

In short, having found no reversible error, we affirm.

Affirmed.

/s/ Donald S. Owens
/s/ Stephen L. Borrello
/s/ Colleen A. O'Brien